[No. D008616. Fourth Dist., Div. One. Aug. 3, 1989.]

GERSTEN COMPANIES, Plaintiff and Respondent, v. DORIS DELONEY, Defendant and Appellant.

**COUNSEL**

Richard Steiner for Defendant and Appellant.

William M. Krause for Plaintiff and Respondent.

**OPINION**

**BENKE, J.—**

### INTRODUCTION

For 10 years appellant and her two children occupied housing subsidized by the federal government. Although her rent was due on the first of each month, on three occasions during a one-year period her rent was five days late and on one occasion her rent was seven days late. We conclude on the

facts of this case, her tardiness was not "material noncompliance" within the terms of her rental agreement. Accordingly, we reverse the judgment which granted her landlord possession of the premises and damages.

FACTUAL SUMMARY

At the time of the proceedings below, appellant Doris Deloney had been an employee of the San Diego County Probation Department for more than eight years. She and her two children began living at the Plaza Manor apartment complex in 1977.

On May 15, 1986, Deloney executed a rental agreement with Plaza Manor Associates (Plaza Manor), the manager of the complex. Under the 1986 agreement Deloney was required to pay $302 a month in rent for the period beginning July 1, 1986. According to the terms of the agreement Deloney's rent was less than the market value of her apartment because of a subsidy provided by the federal government. The agreement required payment of rent by the first of each month and allowed the landlord to impose a $5 late charge if rent was not received until the sixth of the month and a $1 charge for each additional day the rent remained unpaid.

The agreement provided for a month-to-month tenancy, terminable by the tenant on 30 days' notice. The landlord's right to terminate, on the other hand, was limited by regulations of the United States Department of Housing and Urban Development (HUD).[1]

---

[1] The landlord's right to terminate the tenancy was set forth in paragraph 21, subdivisions (b), (c) and (d) of the agreement: "(b) Any termination of this Agreement by the Landlord must be carried out in accordance with HUD regulations, State and local law, and the terms of the Agreement. The Landlord may terminate this Agreement only for: 1. The Tenant's material noncompliance with the terms of this Agreement;

"2. The Tenant's material failure to carry out obligations under any State Landlord and Tenant Act; or

"3. Other good cause, which includes but is not limited to the Tenant's refusal to accept the Landlord's proposed change to this Agreement. Terminations for 'other good cause' may only be effective as of the end of any initial or successive term.

"Material noncompliance includes, but is not limited to nonpayment of rent beyond any grace period available under State law; failure to reimburse the Landlord within 30 days for repairs under paragraph 11 of this Agreement; **repeated late payment of rent**; permitting unathorized [sic] persons to live in the unit; serious or repeated damage to the unit or common areas; creation of physical hazards, serious or repeated interference with the rights and quiet enjoyment of other tenants; failure to repay unauthorized [sic] assistance payments; and giving the Landlord false information regarding income or other factors considered determining the Tenant's rent.

"(c) If the Landlord proposes to terminate this Agreement, the Landlord agrees to give the Tenant written notice of the proposed termination. If the Landlord is terminating this agreement for 'other good cause', the termination notice must be received by the Tenant at least 30 days before the date the Tenant will be required to move from the unit. Notices of proposed termination for other reasons must be given in accordance with any time frames set forth in

On November 5, 1986, Deloney received a notice her tenancy was terminated and that Plaza Manor would commence eviction proceedings within 10 days. The notice further advised Deloney that she could, within 10 days, present to Plaza Manor "any reasons why you believe that the agreement should not be terminated and/or reasons why you should not be evicted." On November 6, 1986, Deloney paid her November rent and a $5 late charge.

Deloney received another notice of termination on December 5, 1986. On December 8, 1986, she paid her December rent along with another late charge. On that day Plaza Manor sent Deloney a letter telling her it could not accept the manner in which she was paying her rent and that in the future she would have to pay her rent with a money order or cashier's check.

On January 5, 1987, Deloney received a third notice of termination. On January 6, 1987, Deloney paid her January rent and a third late charge. On January 7, 1987, Plaza Manor sent Deloney a letter in which she was warned that if her rent was late in the future she would be given a 30-day notice to vacate her apartment.

On May 15, 1987, Deloney executed a rental agreement for the period commencing July 1, 1987. The 1987 agreement was printed on a form identical to the 1986 agreement. The 1987 agreement differed in that Deloney's rent was increased to $331 a month and the $1 a day late charge for payments received after the sixth of each month was deleted.

On August 5, 1987, Deloney received a fourth notice of termination. The next day she paid her August 1987 rent and a fourth late charge.

On August 19, 1987, Plaza Manor sent a letter notice terminating her tenancy as of October 1, 1987, on the ground that "[o]n several occasions

State and local law. Any HUD-required notice period may run concurrently with any notice period required by State or local law.

"All termination notices must: 1. Specify the date this Agreement will be terminated;

"2. State the grounds for termination with enough detail for the Tenant to prepare a defense;

"3. Advise the Tenant that he/she has 10 days within which to discuss the proposed termination of tenancy with the Landlord. The 10-day period will begin on the earlier of the dates that notice was hand delivered to the units or the day after the date the notice is mailed. If the Tenant requests the meeting, the Landlord agrees to discuss the proposed termination with the Tenant; and

"4. Advise the Tenant of his/her right to defend the action in court.

"(d) If an eviction is initiated, the Landlord agrees to rely only upon those grounds cited in the termination notice required by paragraph (c)."

you were sent letters reminding you that your rent is due on the 1st of the month and continued late rent payments would not be tolerated."

## MUNICIPAL COURT PROCEEDINGS

On October 2, 1987, The Gersten Companies (Gersten), owner of the project, filed an unlawful detainer action against Deloney. Deloney answered and the case came to trial in the municipal court on October 21, 1987.

After hearing evidence, the municipal court took the matter under submission and on October 30, 1987, gave judgment to Gersten awarding it possession of Deloney's apartment and $331 in damages plus costs. The municipal court found the five-day period in which Deloney could pay her rent without penalty was a grace period provided by state law and that her payments occurred after that period had run. Thus, the municipal court found the late payments constituted "material noncompliance" with the terms of the rental agreement.

A judgment in favor of Gersten was entered on November 5, 1986, and a writ of possession issued that day. ■■ ■■ ■■ ■■ Deloney was evicted from her apartment on November 11, 1987.[2] She filed a timely notice of appeal.

## APPELLATE DEPARTMENT PROCEEDINGS

The parties stipulated to an engrossed settled statement pursuant to rule 127(c),[3] California Rules of Court. The appellate department of the superior court conducted a hearing on Deloney's appeal on June 17, 1988, and on July 14, 1988, filed an order affirming the judgment of the municipal court.

On July 29, 1988, Deloney filed a petition for rehearing or in the alternative for certification to this court. On August 19, 1988, the appellate department certified the case to this court under rule 63(e). In its order granting certification and transfer, the appellate department found the failure to serve the three-day notice to quit or pay rent required by Code of Civil Procedure[4] section 1161, subdivision 2, did not prevent termination of Deloney's tenancy.

---

[2] Although Deloney was evicted, her eviction did not deprive her of the right to appeal from the judgment. (*Erickson* v. *Boothe* (1947) 79 Cal.App.2d 266, 270-272 [179 P.2d 611].) We express no opinion as to her remedies on remand.

[3] All rule references are to the California Rules of Court unless otherwise specified.

[4] All statutory references are to the Code of Civil Procedure unless otherwise specified.

On September 6, 1988, we transferred the case to this court for hearing and decision.

## ISSUE ON APPEAL

■ We are asked to determine whether Deloney's late payments of rent constituted material noncompliance with her rental agreements such that termination of her tenancy was proper. ■ ■ ■ ■ ■ In view of Gersten's failure to comply with the three-day demand notice required by section 1161, subdivision 2, we conclude that on the facts of this case termination of her tenancy was improper.[5]

## DISCUSSION

The parties agree Deloney's tenancy was protected by the provisions of 24 Code of Federal Regulations sections 247.3 and 247.4. 24 Code of Federal Regulations section 247.3 provides in pertinent part: "(a) General. The landlord may not terminate any tenancy in a subsidized project except upon the following grounds: (1) *Material noncompliance with the rental agreement,*

"(2) Material failure to carry out obligations under any state landlord and tenant act, or

"(3) Other good cause.

".. . . . . . . . . . . . . . ".. . . . .

"(c) *Material noncompliance. The term 'material noncompliance with the rental agreement' shall include: (1) One or more substantial violations of the rental agreement, or (2) repeated minor violations of the rental agreement*

---

[5] A question has arisen with respect to whether this court has jurisdiction to hear this matter. Under rule 107(b)(1), a judgment of the appellate department of the superior court becomes final "15 days after the judgment is pronounced, unless a petition for rehearing is filed within that time." If a timely petition for rehearing is filed, such a judgment becomes final "upon the expiration of 30 days after the judgment is pronounced or upon the denial of all such petitions, whichever is earlier." (Rule 107(b)(2).) Where, as here, there has been no trial in superior court, the superior court may certify the case to this court no later than 10 days after the judgment becomes final in the superior court. (Rule 63(c).) These time limits are jurisdictional. (*Sparrow's Real Estate Service, Inc.* v. *Appellate Dept. of Superior Court* (1965) 236 Cal.App.2d 739, 743 [46 Cal.Rptr. 332]; see also *Corcoran* v. *Universal Guardian Corp.* (1977) 72 Cal.App.3d 904, 911 [140 Cal.Rptr. 421]; *People* v. *Burdzinski* (1981) 118 Cal.App.3d 540, 542-543 [173 Cal.Rptr. 440].) As we interpret the record, the superior court's order affirming the municipal court's judgment was pronounced on July 14, 1988. Deloney's July 29 petition for rehearing was therefore timely, as was the superior court's August 19 order certifying the case to this court.

*that disrupt the livability of the project, adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities, interfere with the management of the project or have an adverse financial effect on the project.* Failure of the tenant to timely supply all required information on income and composition of the tenant household shall constitute a substantial violation of the rental agreement. *Nonpayment of rent or any other financial obligation due under the rental agreement (including any portion thereof) beyond any grace period permitted under state law shall constitute a substantial violation of the rental agreement. The payment of rent or any other financial obligation due under the rental agreement after the due date but within the grace period permitted by state law shall constitute a minor violation.*" (Italics added.)

Under this regulation a tenancy governed by the regulations may not be terminated by a landlord except for some important reason. This conclusion is compelled not only by the regulation's use of the phrases "material noncompliance" and "substantial violation," but by the fact the regulation allows termination for repeated minor violations only when an owner is able to demonstrate adverse consequences to the subsidized project. We also note that prior to adoption of 24 Code of Federal Regulations sections 247.3 and 247.4, courts held that because federally subsidized landlords are essentially agents or partners of the government, due process requires they have "good cause" to evict. (*Joy* v. *Daniels* (4th Cir. 1973) 479 F.2d 1236, 1242-1243; *Appel* v. *Beyer* (1974) 39 Cal.App.3d Supp. 7, 18-20 [114 Cal.Rptr. 336].)

Gersten concedes it did not attempt to show Deloney's repeated late payments interfered with management of the project or had an adverse financial effect on the project. Thus the only ground which supports termination of Deloney's lease is Gersten's claim the late payments were substantial violations because they were made after any grace period allowed by California law. Accordingly, determination of California's grace period, if any, is critical to our disposition of this case.

In determining California's grace period we have found it necessary to engage in a brief historical digression. At common law nonpayment of rent did not operate as a forfeiture of the lease. Nor did it give the landlord any right of reentry. (*Ciapusci* v. *Clark* (1909) 12 Cal.App. 44, 53 [106 P. 436]; 28 A.L.R.2d 806.) Rather "[i]t is the uniform rule at common law and in the absence of contrary statutory provision, both in this country and in England, that a demand for payment must be made by a lessor as a prerequisite to enforcement of a lease provision for forfeiture or termination upon nonpayment of rent." (28 A.L.R.2d 807.) This rule grew out of the law's well-established distaste of forfeitures. (See *Ciapusci* v. *Clark, supra,* 12

Cal.App.3d at p. 53; 28 A.L.R.2d 806.) In England the common law rule was altered by a statute, Act of 4 Geo. II ch. 28, § 2, which allowed ejectment without demand when, among other conditions, rent was six months in arrears. (28 A.L.R.2d 821.)

In some states the English statute, or modern variants with a time limit more suited to commercial and residential tenancies, have been enacted. For instance while at different points in their history Maryland and New Jersey enacted the English statute (28 A.L.R.2d 833, 837), in Oregon and Connecticut the current statutes give a tenant 10 days after rent is due to pay his rent, after which the tenancy may be terminated without further demand. (See Ore. Rev. Stats. § 91.090, Conn. Gen. Stats. Ann., § 47a-15a.)

In a number of other states, including California, New York, Michigan, and Ohio the common law requirement of a personal demand on the tenant has been supplanted in part by three- and seven-day notices to pay rent or quit. (See § 1161, subd. 2; N.Y. Real Prop. Acts. § 711, subd. 2 (McKinney 1979); Mich. Comp. Laws. Ann., § 600.5714, subd. (9) (West 1987); Ohio Rev. Code Ann. § 1923.04.) Moreover, the Uniform Residential Landlord and Tenant Act provides for a 14-day notice to pay or face termination of a rental agreement. (7B West's U. Laws Ann. (1985) U. Residential Landlord and Tenant Act, § 4.201.)

For purposes of determining a "grace period" as that term is used in the federal regulation, we believe it best to look to the statutory successors to the common law requirement of a personal demand for rent. As we have seen, each of the various statutory schemes grows out of a common source, the common law's abhorrence of forfeitures. That source is itself closely related to the federal goal of preventing evictions except for some substantial reason.

We do not believe, as Gersten seems to suggest, that a grace period within the meaning of the regulation is restricted to those statutory schemes, such as Oregon's and Connecticut's, which provide a defined period running from the date rent is due and allow forfeiture thereafter without further demand. Such a narrow interpretation of the regulation would punish subsidized tenants in states, such as California, where, instead of giving tenants a defined period, the state has decided to prevent forfeiture by requiring notice and a specifically defined opportunity to cure. We do not believe a state's decision to provide such added protection should result, under the federal regulation, in its subsidized tenants receiving *no* statutory protection from forfeiture. Such a result is inconsistent with the history of the various statutes and the goal of protecting subsidized tenants from eviction without some substantial violation of their obligations.

In California, section 1161, subdivision 2, is a successor to the common law requirement of a demand. (See *Wickstrom* v. *McGrath* (1927) 86 Cal.App. 651, 655 [261 P. 326]; *Mossi* v. *Fairbanks* (1912) 19 Cal.App. 355, 358 [125 P. 1071].) Under section 1161, subdivision 2, a tenant is guilty of unlawful detainer for a default in payment of rent only after he has been given "three days' notice, in writing, requiring its payment, stating the amount which is due, or possession of the property." ██ Significantly, use of the three-day notice is not restricted to actions under California's summary eviction procedure. Where a landlord does not elect to pursue the summary remedy available under section 1161, he must nonetheless either give the three-day notice required by the statute or provide an opportunity to avoid forfeiture by making the demand for rent required by the common law. (*Wickstrom* v. *McGrath, supra,* 86 Cal.App at p. 655; *Mossi* v. *Fairbanks, supra,* 19 Cal.App. at p. 358; Civ. Code, §§ 791, 792, 793.)

██ Moreover, under California law, the tenant of a dwelling cannot waive the provisions of section 1161, subdivision 2. (Civ. Code, § 1953, subd. (a)(3); see *Folberg* v. *Clara G. R. Kinney Co.* (1980) 104 Cal.App.3d 136, 140 [163 Cal.Rptr. 426].) Thus the existence of the five-day period in which Deloney could pay her rent without paying a penalty could not replace the protection provided by section 1161, subdivision 2.

Use of section 1161, subdivision 2, as a grace period, however, is supported not only by its historical background but by the cases which have interpreted the statute. Thus, the court in *Haydell* v. *Silva* (1962) 201 Cal.App.2d 20, 23 [19 Cal.Rptr. 705], stated: "One of the evident purposes of this section of the law is *to point out specifically to the tenant the amount of rent due, and to give the tenant the opportunity to pay the rent* within the time allowed by the statute. [Citation.] . . . .

"The failure of the tenant to pay rent does not *ipso facto* work a forfeiture of the leasehold; it merely gives the lessor the right to terminate the lease in the manner provided by law, that is, by proceeding in accordance with Civil Code section 791 and Code of Civil Procedure section 1161, subdivision 2. [Citations.]" (Italics added.) (201 Cal.App.2d 23.)

In *Downing* v. *Cutting Packing Co.* (1920) 183 Cal. 91, 96 [190 P. 455] (*Downing*), the court was called upon to interpret the section as it applied to a five-year commercial lease. The court held that under section 1161, subdivision 2: "[I]t must be admitted that the forfeiture does not occur until the last of the acts which are to create it has occurred. It, therefore, does not take place until there has been a failure to pay *the rent during the three days* allowed by the statute. It follows also that if the lease is not terminated by such forfeiture it remains in force for the remainder of the term, or until it is

ended in some manner by some subsequent act or agreement." (*Id.* at pp. 95-96, italics added.)

In *Downing* the guarantor of a tenant's rental payments argued that the tenancy, and its obligations as a guarantor, ended upon service of a notice under section 1161, subdivision 2. However before the period allowed by the notice had run, the landlord collected the late rent from an escrow account established with the guarantor's funds. In finding that the involuntary payment from the account was sufficient to preserve the commercial leasehold, and the guarantor's continuing obligation, the court stated: "The respondent concedes that if [the tenants] had paid the rent themselves at any time within the three days following the service of the notice the lease would have remained in force to the same extent as if no notice had been given. The landlord could not have accepted the rent during that period and at the same time have claimed that the notice itself forfeited the estate and terminated the lease. Since forfeitures are not favored in law, the consequence of these principles would be that if the rent was paid in any manner or from any security provided therefor by [the tenants], or by any other person for their benefit, during the three days, the forfeiture is thereby waived and the lease will remain in force." (*Downing* v. *Cutting Packing Co., supra,* 183 Cal. at p. 96.)

In sum, because by its terms and by the manner it has been interpreted by our courts, section 1161, subdivision 2, gives tenants additional time to pay their rent without endangering their tenancy, it is plainly a grace period provided by California law.

In this case the parties agree Deloney did not receive any notice required by section 1161, subdivision 2. Thus none of the late payments was a "substantial violation" within the meaning of 24 Code of Federal Regulations section 247.3(c). Since, as we have seen, Gersten did not attempt to show Deloney's late payments adversely affected the project or its financial stability (see 24 C.F.R. § 247.3(c)(2)), there is nothing in the record before us which supports the trial court's determination Deloney had been guilty of "material noncompliance." Accordingly the judgment in favor of Gersten must be reversed.

In reaching this conclusion we are sensitive to the administrative concerns of landlords who operate subsidized housing projects. However we do not believe our holding adds materially to their burdens. Where a tenant is persistently tardy with rental payments, but nonetheless pays on or before the end of the three-day period provided by section 1161, the regulations themselves allow termination of the rental agreement upon a showing such payments have adversely affected the project. (24 C.F.R. § 247.3(c)(2).)

Moreover under the terms of Deloney's lease (fn. 1, *ante*) and the holding of one court which has interpreted a state statute similar to section 1161, subdivision 2 (*Sandefur Co.* v. *Jones* (1982) 9 Ohio App.3d 85 [458 N.E.2d 390, 394]), state and federal notices may run concurrently. Because under the federal regulation a landlord must give a tenant 10 days' notice of termination (24 C.F.R. § 247.4), the added requirement that at the same time the landlord gives a tenant 3 days to pay any back rent should not materially impair a landlord's ability to profitably operate a subsidized project.[6]

Wiener, Acting P. J., and Nares, J., concurred.

---

[6] Because the issue was not presented to either the trial court or to us, we express no opinion on whether the landlord's acceptance of the rent on the facts of this case constituted a waiver of his right to seek to terminate the lease for failing to pay rent in a timely manner.