Opinion
HOLMES, Acting P. J.
These cases present the question, novel to the California appellate courts, whether housing projects carried out by joint participation of private enterprise and government under section 221(d)(3) of the National Housing Act (12 U.S.C. § 17151(d)(3)) and section 101 of the Housing and Urban Development Act of 1965 (Pub. L. No. 89-117, Aug. 10, 1965, 12 U.S.C. § 1701s) involve such “state action” that due process of law, including notice and proof of good cause for eviction, must be accorded a tenant who holds over after expiration of the agreed term of his tenancy.[1] We answer this question in the affirmative.
In the Appel case (C. A. No. 13237) the landlord operates a residential apartment complex called Sherman Oaks Manor whose construction was largely financed by a federally guaranteed mortgage loan resulting, the trial court found, in the tenant receiving “the benefit of a lower than market charge.”
In the Korda case (C. A. No. 13286) the landlord operates a similarly financed residential project called Panorama View Apartments. He re *Supp. 10 ceives part of the rent in the form of “rent supplement” payments by the Federal Housing Administration (FHA)[2] on behalf of the tenant.
In each case, the landlord is required, in consideration of financial benefits received, to accept only low or moderate income tenants whose eligibility is previously approved by FHA. In each case the landlord and tenant entered into a written month-to-month lease on a form supplied by FHA containing a provision that either party might terminate upon expiration of any term by giving 30 days’ prior notice. Neither lease expressly required notice of good cause or hearing and proof thereof as a condition to such termination, nor did any FHA regulation purport to require them.
In each case, the landlord gave the tenant the 30-day notice of termination prescribed by section 1946 of the Civil Code and sued for unlawful detainer under section 1161 et seq. of the Code of Civil Procedure when the tenant failed to vacate. Each tenant pleaded affirmatively that a due process notice and hearing of cause was necessary in view of the governmental involvement in the housing project. Rejecting this contention, the trial court in each case rendered judgment for possession and overdue rent in favor of the landlord. The tenants appealed and the trial court stayed judgment pending appeal.
The Appel case is before us on the clerk’s transcript. The trial court made extensive findings of fact. Condensed, they declare: The Sherman Oaks Manor project was created to provide decent housing for low and moderate income families pursuant to section 221(d)(3) of the National Housing Act and financed by a 40-year mortgage loan of $1,630,000 bearing interest at 3 percent, below the market rate. The project’s owners received income tax benefits not accorded to nonfederally involved housing projects. In order to obtain section 221(d)(3) benefits, the owners were required to obtain FHA approval of major decisions concerning planning, construction and management of the project, and to enter into a “regulatory agree- ■ ment” with FHA governing its operation. Some of the facts so found will be hereinafter referred to in more detail.
The Housing Act of 1937 (Sept. 1, 1937, ch. 896, § 1, 50 Stat. 888 as amended; 42 U.S.C. § 1401) declared it to be “the policy of the United States to promote the general welfare of the Nation by employing its funds and credit ... to assist the several States and their political subdivisions *Supp. 11 to ... remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe and sanitary dwellings for families of low income . . . .” In 1961, section 221(d)(3) was adopted (Pub. L. No. 87-70, § 101(a), June 30, 1961, 75 Stat. 149, 12 U.S.C. § 1715l) with the legislative statement that it was “designed to assist private industry in providing housing for low and moderate income families . . . ,” thus enlisting private capital in the government’s fight against substandard housing. (See Procedural Due Process In Government-Subsidized Housing (1972) 86 Harv. L. Rev. 880, 882-883.)
The findings of the trial court in the Appel case reflect the breadth and depth of this joinder of government and private enterprise to achieve a public purpose. First, private capital is wooed by the incentive of small investor’s outlay in proportion to the total capital commitment. The private investor need hazard no more than 10 percent of the project cost. He is offered very long-term financing (40 years) at an interest rate of 3 percent or less and is assured a market for such financing by federal insurance of the loan (12 U.S.C. § 1715l). He is offered favorable income tax benefits. These inducements manifestly are not intended to enrich landlords but to enlist private capital in implementation of the government’s housing policy.
The federal government’s devotion to this policy is reflected by the manner in which private capital is induced to invest. Instead of guaranteeing investors a profitable return, the government modified the structure of its income tax laws to make investment in federally assisted housing projects attractive regardless of operational profit or loss.[3] In consequence, the *Supp. 12 owner of such a project is not vitally concerned with profitability of its day-to-day operation in the way that a traditional landlord is concerned with the operating results of his venture. Much of the daily function and involvement of the traditional landlord has been transferred, in federally assisted projects, from the landlord to FHA as the supervising agency. (See: McQueen v. Druker (D.Mass. 1970) 317 F.Supp. 1122, 1131; same case on appeal, McQueen v. Druker (1st Cir. 1971) 438 F.2d 781.)
The restrictions imposed on the owner by the FHA lease form and the “regulatory agreement” with FHA again underscore the government’s purpose to make private capital a tool of government housing policy. The owner may accept as tenants only those of low or moderate income as defined by FHA. He must give preference to applicants who hold FHA certificates of eligibility. He must terminate the tenancy of any tenant who ceases to meet such definition. He must require the tenant to requalify at any time requested by FHA. He may charge rents only at rates approved by FHA and may not increase them without FHA approval. These limitations on traditional freedom of the landlord can have no other purpose than furtherance of the government’s drive for decent housing for persons of modest means.
Other features of the relationship between owner and FHA covered by the findings point clearly to the predominance of the federal government’s interest. Thus, the surveillance by FHA of the project’s economic feasibility, design, title status, street access, owner’s credit, construction costs and, especially, the right of FHA to step in and take over management in event of default, all demonstrate that protection of the government’s financial commitment to the project is a primary objective.
The limitation on distribution of earnings, the requirement for maintenance of reserves and disbursement only of “surplus” cash and the provision for periodic reports by the owner to FHA all strongly suggest the government’s concern for permanence and continuity of the housing project as well as for safety of the government’s financial commitment.
*Supp. 13 The obligations imposed by the FHA lease document on the tenant to supply on request full information regarding his income and to vacate or pay increased rent if his initial eligibility ceases, also demonstrate the government’s purpose that this privately owned enterprise be so operated as to implement the federal housing policy.
It thus appears that the primary function of this owner and this housing project is to provide a conduit for federal power to turn the wheel of federal policy. Any benefit to the owner or tenant is a product of government action. The government is, essentially, the landlord. Without the government, there would be no such low-cost housing; with the government, the quality and cost of the housing is such as the government allows.
It is well established that “the government as landlord is still the government. It must not act arbitrarily, for unlike private landlords, it is subject to the requirements of due process of law.” (Rudder v. United States (1955) 226 F.2d 51, 52 [96 App.D.C. 329].)
The findings of the trial court, above set forth, demonstrate to our satisfaction that the federal government “has so far insinuated itself into a position of interdependence” with this housing project that “the government must be recognized as a joint participant” therein, and that because of such governmental involvement the project “cannot be considered to have been so ‘purely private’ as to fall without the scope of” due process requirements inhibiting governmental action. (Burton v. Wilmington Pkg. Auth. (1961) 365 U.S. 715, 725 [6 L.Ed.2d 45, 52, 81 S.Ct. 856].)[4]
McQueen v. Druker (1st Cir. 1971) 438 F.2d 781 held that a section 221(d)(3) housing project on a site acquired by exercise of the state’s power of eminent domain and operated under supervision of a public urban renewal agency involved “state action” under the Fourteenth Amendment. The court said, at pages 784-785: “Here the landlords are, in return for an assured consideration, and subject to specific and continuing oversight, helping the state realize its specific priority objective of providing for urban renewal displacees and its more general goal of providing. good quality housing at rents which can be afforded by those of low and moderate income. . . . [T]he government has chosen to attract the participation of private persons in carrying out a specific governmental purpose.
*Supp. 14 “[W]e conclude that at least when a specific governmental function is carried out by heavily subsidized private firms or individuals whose freedom of decision-making has, by contract and the reserved governmental power of continuing oversight, been circumscribed substantially more than that generally accorded an independent contractor, the coloration of state action fairly attaches.”[5]
We find that the scope of governmental involvement in the section 221(d)(3) Sherman Oaks Manor project, as found by the trial court, brings the instant case within the ambit of the above-quoted definition of governmental action in due process context.
In Tompkins Square Neighbors, Inc. v. Zaragoza (1971) 68 Misc.2d 103 [326 N.Y.S.2d 665] the landlord of a minimum capital, limited dividend housing project formed under state law, and characterized in the court’s opinion (p. 667) as organized “similarly” to the section 221(d)(3) project considered in McQueen, supra, sought to evict a tenant without notice or proof of cause.
The issue was thus stated by the court: “Does a tenant in a ‘private’ redevelopment housing project have the same constitutional rights as a tenant in a public housing project so that he must receive notice of the reasons why his tenancy is being terminated, as well as a fair hearing, before an eviction order is issued by this Court?” (326 N.Y.S.2d at p. 666.) The *Supp. 15 court held the tenant to be entitled to due process notice and hearing before eviction.[6]
In McClellan v. University Heights, Inc. (D.R.I. 1972) 338 F.Supp. 374 the landlord of a section 221(d)(3) housing project declined,without giving any reason, to renew the tenancy of plaintiffs who had occupied an apartment for three years. They sued to enjoin eviction. Said the court (pp. 379-380): “The right to decent housing at a rent that can be afforded, the right not to be uprooted, the right to stability as a participant in a particular community, and the right to be left alone are all substantial personal rights involved in the instant litigation. [Citations.] The worth of such rights to a tenant is insusceptible of pecuniary valuation.”
The housing facility in McClellan, supra, was constructed on a site obtained by exercise of the state’s power of eminent domain and sold to the private developer, who obtained section 221(d)(3) mortgage-guaranteed financing subject to the kind of regulations and restrictions found by the court to have been imposed on the landlord in the instant case. The court concluded (p. 382): “I find that there is sufficient governmental involvement ... in terms of subsidization and control and that University Heights sufficiently carries out a specific governmental function to warrant application of the Fourteenth Amendment to this landlord’s actions. [Citations omitted.]” The tenant was granted an injunction against summary eviction.
We conclude that the attempted eviction of appellants in the Appel case involves governmental action under the Fifth Amendment.
We also are of the opinion that the government’s policy of obtaining decent housing for persons of modest means at a price they can afford by inducing private enterprise to supply such housing through federal subsidization and the implementation of that policy by providing the section 221 (d)(3) facilities here involved, coupled with acceptance and reliance thereupon by appellant tenants herein, created in appellants a “status by entitlement,” a species of property, protected by constitutional guarantees of due process of law. A necessary corollary is that appellants may not be deprived of that status through eviction from their home by governmental action without prior notice and proof of good cause.
*Supp. 16 Goldberg v. Kelly (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] held that recipients of cash welfare payments under the federally assisted program of Aid to Families with Dependent Children and a New York state and local relief program must be accorded procedural due process before such assistance may be discontinued. The court pointed out that “welfare provides the means to obtain essential food, clothing, housing and medical care.” (Italics added.) (397 U.S. at p. 264 [25 L.Ed.2d at p. 297].) It was held that a post-termination inquiry into a welfare recipient’s eligibility to continue receiving such benefits, although conducted with full procedural due process was insufficient. “ ‘By hypothesis,’ ” said the court (397 U.S. at p. 261 [25 L.Ed.2d at pp. 295-296]), “ ‘a welfare recipient is destitute, without funds or assets. . . . [T]o cut off a welfare recipient in the face of . . . “brutal need” without a prior hearing of some sort is unconscionable, unless overwhelming considerations justify it.’
“Such benefits are a matter of statutory entitlement for persons qualified to receive them. Their termination involves state action that adjudicates important rights.” (Italics added.)
The reasoning of Goldberg v. Kelly, supra, has been held to protect tenants of publicly owned low-cost housing from causeless eviction. (Caulder v. Durham Housing Authority (4th Cir. 1970) 433 F.2d 998, 1002; Escalera v. New York City Housing Authority (2d Cir. 1970) 425 F.2d 853, 861. See also, Burr v. New Rochelle Municipal Housing Authority (S.D.N.Y. 1972) 347 F.Supp. 1202, 1206; Vinson v. Greenburgh Housing Authority (1968) 29 App.Div.2d 338 [288 N.Y.S.2d 159, 163-164].)
In Joy v. Daniels (4th Cir. 1973) 479 F.2d 1236 the attempted eviction was from privately owned but government-assisted housing.. The court concluded that the tenant has “a property right or entitlement to continue occupancy until there exists a cause to evict other than the mere expiration of the lease” and held invalid an effort to evict a tenant from a section 221(d)(3) project without notice and proof of cause (p. 1241).[7]
Respondents cite no case holding that a federally assisted but privately *Supp. 17 owned housing project is immune from procedural due process requirements in eviction of tenants, and we find none.
Respondents contend that it would be unfair to deny them the unfettered right to evict a tenant without notice and proof of cause -because (1) their profit from operation of the project depends on efficient management, (2) they would not have purchased the property had they suspected they would be subjected to the burden of procedural due process in evictions, and (3) the end effect may be to dry up private capital for low and middle income housing.
The third contention, if tenable, calls for legislative relief with which we can have no concern. The first and second contentions, if factually valid (see fn. 3, supra), are answered by Goldberg v. Kelly, supra, wherein it was held that determination of what constitutes procedural due process in such cases requires a weighing of the opposing interests (397 U.S. at pp. 263-264 [25 L.Ed.2d at pp. 296-297]). Housing was there named as one of the basic needs met by public financial assistance to the poor and deprival of such assistance was held to create an immediately “desperate” situation. The urgency of the welfare recipient’s need was seen to outweigh the risk of welfare abuse during the time required to determine if eligibility had ceased (397 U.S. at p. 264 [25 L.Ed.2d at p. 297]). Although a section 221(d)(3) tenant may not live on the same thin financial edge as a full wefare recipient, the disadvantages to him of unwarranted eviction from his home in a condition of financial stringency clearly outweigh the interest of the landlord in being rid of an unwelcome tenant during the short time required to prove cause for eviction upon termination of the lease term.[8] (See McQueen v. Druker, supra, 317 F.Supp. 1122, 1130.)
The record on appeal in the Korda case (Civ. A. No. 13286) shows, in addition to the facts hereinbefore stated in reference thereto, that besides receiving the benefits and bearing the burdens of a section 221(d)(3) housing project, the landlord receives “rent supplement” payments from FHA enabling the tenant, Lucy McDaniels, to live in a $166 per month apartment by paying only $68 each month.
In Joy v. Daniels, supra, 479 F.2d 1236, it was held that the combination of mortgage benefits and regulatory burdens of the landlord inherent in the section 221(d)(3) privately owned housing program, plus the invocation by the landlord of the state’s (South Carolina) eviction *Supp. 18 procedure and local governmental approval of “rent supplements” under 12 United States Code section 1701s, demonstrated sufficient involvement of state and local government to constitute state action within the meaning of the Fourteenth Amendment.[9]
In Anderson v. Denny (W.D.Va. 1973) 365 F.Supp. 1254, housing was supplied under section 236 of the National Housing Act (12 U.S.C. § 1715 z-1). It involved low mortgage interest and guarantee benefits and rent supplement payments. Eviction was held to involve governmental action, requiring procedural due process under the Fifth and Fourteenth Amendments (p. 1259). (To like effect see Bonner v. Park Lake H. D. F. C. (1972) 70 Misc.2d 325 [333 N.Y.S.2d 277].)
Counsel for appellants in the Korda case make the arguments, in addition to those previously discussed in our consideration of the Appel case, that requirement of proof of cause for eviction, right to cross-examine witnesses and access by the tenant to the landlord’s evidence would set tenant against tenant, discourage informing against one tenant by another, destroy social amenities in housing projects, discourage witnesses from giving evidence and make it difficult or impossible for the landlord to prove cause for eviction. Disregarding the obvious inconsistencies in this multiple contention, it amounts to an assertion that justice should attribute more weight to the landlord’s burdens than to the tenants’ rights. The adjudicated precedents, hereinabove discussed, establish the contrary.
We conclude that in both the Appel and Korda cases the trial court erred in rendering judgment for respondent landlord. In each case the tenant pleaded governmental involvement and lack of notice and proof of cause as an affirmative defense. This defense relates to the issue of right to possession and was properly raised. (Code Civ. Proc. § 117c; *Supp. 19 Green v. Superior Court (1974) 10 Cal.3d 616, 632-634 [111 Cal.Rptr. 704, 517 P.2d 1168].) In the Appel case the trial court erroneously concluded that the facts did not establish the pleaded defense. In the Korda case the trial court erroneously ruled that defendant’s affirmative pleading did not state a valid defense.
Because of the holding in each case that the tenant was not entitled to notice and proof of cause for eviction, the trial court did not reach the question of what kind of notice and what sort of hearing on the issue of good cause must be given to satisfy the requirement of procedural due process of law. Because this issue necessarily will arise in event respondents pursue their efforts to oust appellants, we briefly address it.
The best procedural due process in such cases would be (1) a written notice from landlord to tenant setting forth the facts claimed to constitute good cause for eviction and (2) pleading and proof of those facts in the subsequent unlawful detainer action. This is the procedure recommended by a number of the courts considering the problem. (Thorpe v. Housing Authority (1969) 393 U.S. 268 [21 L.Ed.2d 474, 485, 89 S.Ct. 518]; McQueen v. Druker, supra, 317 F.Supp. 1122, 1131-1132; Tompkins Square Neighbors, Inc. v. Zaragoza, supra, 326 N.Y.S.2d 665, 667-668 [same case on subsequent proceedings 68 Misc.2d 955, (328 N.Y.S.2d 362, 363)]; Caulder v. Durham Housing Authority, supra, 433 F.2d 998, 1003-1004; Escalera v. New York City Housing Authority, supra, 425 F.2d 853, 863-864; Joy v. Daniels, supra, 479 F.2d 1236, 1242-1243; Anderson v. Denny, supra, 365 F.Supp. 1254, 1260-1262; cf. Brown v. Housing Authority of City of Milwaukee (E.D.Wis. 1972) 340 F.Supp. 114, 115-116.) Administrative type procedures that avoid judicial hearings, while sometimes nominally approved (see Matter of Fuller v. Urstadt (1971) 28 N.Y.2d 315 [321 N.Y.S.2d 601, 270 N.E.2d 321, 323]; Bonner v. Park Lake H. D. F. C. (1972) 70 Misc.2d 325 [333 N.Y.S.2d 277, 281-283]) have not always had acceptance when challenged (e.g., Caulder v. Durham Housing Authority, supra, 433 F.2d 998, 1000-1003).
What constitutes “good cause” for eviction in a given case depends on the facts perceived in relation to the purposes of the relevant housing law and the posture of the affected parties. (See, e.g., McQueen v. Druker, supra, 317 F.Supp. 1122, 1125-1127; Vinson v. Greenburgh Housing Authority (1968) 29 App.Div.2d 338 [288 N.Y.S.2d 159, 166].) In some instances it has been intimated that guidelines to good cause for eviction are found in the definition of “undesirable” tenants set forth in regulations of the supervising public agency. (Tompkins Square Neighbors, Inc. v. Zaragoza, supra, 328 N.Y.S.2d 362, 363; Escalera v. New York *Supp. 20 City Housing Authority, supra, 425 F.2d 853, 857, 867) or in the “standards for eligibility” established by such regulations (Vinson v. Greenburgh Housing Authority, supra, 288 N.Y.S.2d 159, 161) or simply in destructive or anti-social conduct of the tenant (Joy v. Daniels, supra, 479 F.2d 1236, 1238, fn. 2.)
The judgments in Civ. A. No. 13237 and Civ. A. No. 13286 are reversed. Appellants in each case to recover their costs on appeal.
Marshall, J., and Cole, J., concurred.

California courts have held that a publicly owned and operated housing project may not arbitrarily discriminate in the selection or eviction of tenants (Banks v. Housing Authority (1953) 120 Cal.App.2d 1 [260 P.2d 668]; Housing Authority v. Cordova (1955) 130 Cal.App.2d Supp. 883 [279 P.2d 215]). Those cases are to be distinguished from the ones at bench not only because the former involved publicly rather than privately owned housing facilities, but also because the reason asserted for exclusion or eviction of the tenant was constitutionally forbidden instead of, as in the instant cases, no reason at all being given, as permitted by the terms of the lease and the eviction statute.

The functions of the Federal Housing Administration (FHA) and its successor, Housing and Home Finance Agency, were taken over by the Secretary of Housing and Urban Development (HUD) under the 1965 amendments to the National Housing Act. (Pub.L. No. 89-174, § 5, Sept. 9, 1965, 79 Stat. 669, 42 U.S.C. § 3534.) The FHA abbreviation is to be read as HUD when appropriate.

The following discussion of federal income tax advantages for the owner of section 221(d)(3) housing facilities is from 4 Urban Law. 251, 253-254: “Government-assisted housing for low and moderate income families does not provide large profits for investors. In fact, some programs require the sponsor to be a limited dividend entity which may not distribute, annually, an amount exceeding six percent of its capital. The real business incentive lies in ‘paper losses,’ not profits, which are generated by two factors: (1) Accelerated depreciation is available for the first user of residential property. Depreciation may be computed on the double declining balance or the sum-of-the-years-digits method, with a 40-year useful life and no salvage value. The Tax Reform Act of 1969, which closed many other avenues of accelerated depreciation, left this one open in order to encourage the construction of badly needed housing. (2) There is a leverage factor of almost nine-to-one in housing projects constructed with federally insured mortgages. The FHA will generally insure a mortgage equal to ninety percent of the total cost of land and buildings. The owner may depreciate the entire cost of the buildings, using one of the accelerated methods, even though his equity is only ten percent of the project cost, and the remaining ninety percent is financed with borrowed money insured by the United States Government. Some states, notably New York and New Jersey, provide mortgage financing up to ninety-five percent or even more.
*Supp. 12 “An important tax incentive to the construction of low and moderate income housing was created by the Tax Reform Act of 1969. Section 1039 of the Internal Revenue Code states that any capital gain realized on the sale of a project financed under Section 221(d) (3) or Section 236 of the Housing Act is not recognized, provided : (1) the property is sold to a tenant cooperative or other non-profit organization formed solely for the benefit of the tenants and (2) the proceeds are reinvested in another Section 221(d)(3) or Section 236 project within one year. Moreover, full exemption from recapture of excess depreciation is achieved after 120 months with low and moderate income housing compared to 200 months with conventional units.”

In Burton, supra, it was held that the State of Maryland was so deeply involved in assistance to a publicly owned parking garage project that operation of a restaurant therein constituted “state” action within the meaning of Fourteenth Amendment. In the instant case, we deal with federal government action, constitutionally limited by the Fifth Amendment.

The opinion above quoted was rendered on determination of an appeal from the decision in McQueen v. Druker (D.Mass 1970) 317 F.Supp. 1122. The district court had found that the tenant was threatened with eviction by constitutionally excessive governmental action at both the federal and state levels in that (1) there was no due process notice and proof of good cause for eviction and (2) the threatened eviction was motivated by retaliation for the tenant’s exercise of First Amendment rights. As to the first ground, the district court held that the tenant had such a “status of entitlement” (citing Goldberg v. Kelly (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011] and the state and federal governments were so deeply involved (citing Colon v. Tompkins Square Neighbors, Inc. (S.D.N.Y. 1968) 294 F.Supp. 134; Burton v. Wilmington Pkg. Auth. (1961) 365 U.S. 715 [6 L.Ed.2d 45, 81 S.Ct. 856]; Vinson v. Greenburgh Housing Authority (1968) 29 App.Div.2d 338 [288 N.Y.S.2d 159]; and Escalera v. New York City Housing Authority (2d Cir. 1970) 425 F.2d 853) that the section 221(d)(3) landlord could not invade that status without according the tenant due process under the First, Fifth and Fourteenth Amendments. On appeal, the Court of Appeals decided that local governmental action was involved in the threatened eviction by a seqtion 221(d)(3) landlord’s retaliation for the tenant’s exercise of First Amendment rights and declared it unnecessary to consider the other ground of the trial court’s decision—i.e., that notice and proof of good cause is a precondition to eviction by a section 221(d)(3) landlord. (438 F.2d at pp. 785-786.)

The housing project involved in the Tompkins case apparently involved payment of rent supplements to the landlord by government on behalf of tenants. See: Colon v. Tompkins Square Neighbors, Inc. (S.D.N.Y. 1968) 294 F.Supp. 134, 137, referred to at 326 N.Y.S.2d page 667. However, this fact is not mentioned in the court’s analysis of the landlord’s status (326 N.Y.S.2d p. 666).

The section 221(d)(3) landlord involved in Joy, supra, also received rent supplements, a feature not present in the instant Appel case. This difference is not significant in relation to the expectations of tenants concerning continuity of their tenancy.

The statutory remedies of the landlord for summary eviction in case of nonpayment of rent are not involved in the instant cases.

In view of our holding that appellants have been denied due process of law because of federal involvement, it is not necessary to consider whether entertainment of these eviction proceedings by our local courts or payment of rent supplements involve “state” action by California or its agencies. The record in the Appel case points to no such involvement except resort by the landlord to the state’s statutory unlawful detainer remedy. The record in the Korda case does not show whether the rent supplement payments by FHA on behalf of the tenants are supported by adoption by the City of Los Angeles of a “workable program” of community improvement or by official approval by the City of such payments. (See 42 U.S.C. § 1451(c) [Pub.L. No. 91-152, tit. II, § 217(a), 83 Stat. 390, Dec. 24, 1969]; 24 C.F.R. § 215.15(c).) Joy v. Daniels, supra, held the combination of giving local official approval to rent supplement payments and providing a statutory forum for eviction proceedings is “state” action under the Fourteenth Amendment. But it has been held that the latter factor, standing alone, is not. (McGuane v. Chenango Court, Inc. (2d Cir. 1970) 431 F.2d 1189, cert. den., 401 U.S. 994 [28 L.Ed.2d 532, 91 S.Ct. 1238].)