[No. B237629. Second Dist., Div. Seven. Apr. 23, 2012.]

ANCHOR PACIFICA MANAGEMENT COMPANY, Plaintiff and Respondent, v.
SHARON GREEN, Defendant and Appellant.

**COUNSEL**

Andrew Radel and Jolene Larimore for Defendant and Appellant.

Neighborhood Legal Services of Los Angeles County, Maria Palomares, David Pallack; Western Center on Law and Poverty, Stephanie Haffner; National Housing Law Project and Catherine Bishop for Coalition for Economic Survival as Amicus Curiae on behalf of Defendant and Appellant.

Bruce T. McIntosh for Plaintiff and Respondent.

**OPINION**

**PERLUSS, P. J.**—Must a management company operating a senior apartment complex developed with assistance from a local redevelopment agency and subject to agency oversight identify good cause when it evicts a tenant participating in the agency's housing assistance program upon expiration of the tenant's lease? Sharon Green, who is disabled and receives federal income-supplement benefits, contends the trial court erred when it denied her motion to dismiss this unlawful detainer action on the ground her eviction without cause from her subsidized apartment at the end of her lease violated her right to due process under the state and federal constitutions or, in the alternative, failed to allow her to present this defense to the jury. We agree on the facts of this case Green's eviction from government-subsidized and

regulated low-income housing constituted state action that deprived her of a protected property interest. Accordingly, we reverse the judgment entered after a jury rejected Green's alternate defense of retaliatory eviction and order judgment entered in her favor.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1990 the City of Glendora Community Redevelopment Agency (City) entered into a development agreement with Andover Glendora Associates (Andover), a private developer, to build between 146 and 156 units of senior housing (Heritage Oaks Apartments) on a parcel previously donated to the City for that purpose. In exchange for a 55-year lease of the property, Andover agreed to develop the land pursuant to the City's specifications, maintain the development with City oversight and pay the City a minimum (at the commencement of the lease) of 20 percent of the net proceeds of the development. Upon expiration of the ground lease, ownership of the improvements will revert to the City as owner of the land.

The development agreement and ground lease require Andover to reserve—throughout the lease term—30 percent of the permitted units for low- and very-low-income tenants whose rents are required to be set at levels commensurate with comparable affordable housing guidelines. The City is required to provide Andover a list of prospective tenants whose eligibility for the affordable units has been determined by the City for use in selecting tenants for the affordable units. The City reserved the right to provide assistance to any tenants on the site from available housing assistance funds. Although the City disavowed any obligation to fund such subsidies, once assistance had been provided to a particular tenant, the City committed it would not withdraw assistance for a period of five years. Andover agreed to accept any subsidies paid by the City and to accept the low- and very-low-income tenants referred by the City "subject to standard background and credit report inquiries at [Andover's] discretion." Throughout the lease term Andover is required to submit quarterly reports to the City certifying its compliance with the affordable housing component of the agreement.

After construction of the Heritage Oaks Apartments complex, 47 units of the 151 units were set aside for low- and very-low-income tenants, some of whom, in addition to mandatory limitations on their rent, received additional assistance in the form of rent subsidies. Over the years these subsidies were funded either by federal housing programs or by funds set aside by the City for that purpose. Although the City does not appear to have subsidized all tenants of the low-income units, once a subsidy had been approved, there is no evidence in the record the City discontinued or terminated that subsidy.

In October 2007 Green was certified by the City as eligible for one of the low-income housing units. She moved into the Heritage Oaks Apartments, which are managed by Anchor Pacifica Management Company (Anchor Pacifica), and signed a one-year lease for a unit with a monthly rent of $740. Green paid $328; the City paid Anchor Pacifica the remainder of Green's rent. In December 2008, subject to a renewed one-year lease, Green moved to a first floor apartment with a monthly rent of $758, of which she paid $213. On January 10, 2009 Green signed another one-year lease at the same monthly rate, and the City again subsidized her rent.

On October 8, 2009 Anchor Pacifica served Green with a 90-day eviction notice. The notice did not provide any reason for the termination of her tenancy at the conclusion of her lease. An unlawful detainer action was filed on January 21, 2010. Green answered, asserting, among other defenses, Anchor Pacifica's attempt to evict her without good cause violated her federal and state right to due process. On June 7, 2010 she moved to dismiss the action on the ground Anchor Pacifica had failed to provide good cause for her eviction or, in the alternative, to allow her to present that defense to the jury.

Before trial the court conducted an evidentiary hearing under Evidence Code section 402 to determine whether Green would be permitted to assert as a defense her due process right to good cause eviction. Following completion of the evidentiary hearing on August 17, 2010, the trial court denied the motion, ruling Green had "failed to prove or show she has an enforceable right [to the subsidy]; the plaintiff is not required to provide good cause notice for terminating a month to month tenancy." The case proceeded to trial, and the jury found in favor of Anchor Pacifica, rejecting Green's defense of retaliatory eviction. Judgment was entered on September 17, 2010, and Green was evicted.

Green appealed to the appellate division of the superior court, which affirmed the judgment based on a lack of state action: The appellate division concluded the City had not been sufficiently involved with either the project or Green's tenancy to subject Anchor Pacifica's decision to evict Green at the end of her lease to constitutional limitations. We granted Green's petition to transfer the appeal to this court pursuant to California Rules of Court, rule 8.1006.

## DISCUSSION

### 1. *Due Process Protections for Low-income Tenants*

The Fourteenth Amendment to the United States Constitution prohibits any state deprivation or termination of a protected property interest

without procedural due process safeguards. "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." (*Mathews v. Eldridge* (1976) 424 U.S. 319, 332 [47 L.Ed.2d 18, 96 S.Ct. 893].) As relevant here, a protected property interest may be terminated or withdrawn by governmental action only for cause. (*Logan v. Zimmerman Brush Co.* (1982) 455 U.S. 422, 430 [71 L.Ed.2d 265, 102 S.Ct. 1148].)

 The California Constitution contains a similar due process guarantee: Article I, section 7, subdivision (a), states a person may not be deprived of life, liberty or property without due process of law.[1] "[T]he core purpose of procedural due process [is] ensuring that a citizen's reasonable reliance is not frustrated by arbitrary government action." (*Castle Rock v. Gonzales* (2005) 545 U.S. 748, 792, fn. 20 [162 L.Ed.2d 658, 125 S.Ct. 2796] (dis. opn. of Stevens, J.).) Even in an action against a nominally private entity, a due process claim is properly allowed when the state has been sufficiently involved with the private entity's conduct to hold that entity to the standards imposed on governmental actions that deprive a person of a protected property interest: " 'Conduct that is formally "private" may become so entwined with governmental policies or so impregnated with a governmental character as to become subject to the constitutional limitations placed upon state action.' " (*Mulkey v. Reitman* (1966) 64 Cal.2d 529, 536–537 [50 Cal.Rptr. 881, 413 P.2d 825], affd. (1967) 387 U.S. 369 [18 L.Ed.2d 830, 87 S.Ct. 1627].)

Nearly 40 years ago the appellate department of the Los Angeles Superior Court considered whether "housing projects carried out by joint participation of private enterprise and government under [federal housing programs] involve such 'state action' that due process of law, including notice and proof of good cause for eviction, must be accorded a tenant who holds over after expiration of the agreed term of his tenancy." (*Appel v. Beyer* (1974) 39 Cal.App.3d Supp. 7, 9 [114 Cal.Rptr. 336] (*Appel*).) The issue, substantially similar to the question now before us, was presented in two cases, the first

---

[1] Although the wording of the California Constitution parallels in part that contained in the Fifth and Fourteenth Amendments to the United States Constitution, the rights guaranteed by the state Constitution are not dependent on those guaranteed by the United States Constitution. (Cal. Const., art. I, § 24.) The scope of rights secured to the people of California by their Constitution is to be determined by the state courts, "informed but untrammelled by the United States Supreme Court's reading of parallel federal provisions." (*Reynolds v. Superior Court* (1974) 12 Cal.3d 834, 842 [117 Cal.Rptr. 437, 528 P.2d 45], disapproved on other grounds in *Izazaga v. Superior Court* (1991) 54 Cal.3d 356 [285 Cal.Rptr. 231, 815 P.2d 304]; see also *Gay Law Students Assn. v. Pacific Tel. & Tel. Co.* (1979) 24 Cal.3d 458, 469, fn. 8 [156 Cal.Rptr. 14, 595 P.2d 592] [" '[w]e by no means imply that the California due process clause must in all instances be interpreted identically with the due process clause of the Fifth Amendment' "].)

involving a tenant who paid a below market rate due to the landlord's receipt of a federally guaranteed mortgage loan under section 221, subdivision (d)(3), of the National Housing Act (12 U.S.C. § 1715*l*(d)(3)), and the second involving a tenant of a similarly financed residential project whose landlord also received rent supplement payments from the Federal Housing Administration (FHA). (*Appel*, at pp. Supp. 9–10.) Both tenants had signed month-to-month leases that did not require good cause for termination. In each case, among other restrictions, the landlords were required to accept only low- or moderate-income tenants whose eligibility had been predetermined by the FHA. (*Id.* at p. Supp. 12.) As the court noted, "[t]hese limitations on traditional freedom of the landlord can have no other purpose than furtherance of the government's drive for decent housing for persons of modest means." (*Ibid.*)

■ In the context of publicly subsidized housing projects, the court reasoned "the primary function of this owner and this housing project is to provide a conduit for federal power to turn the wheel of federal policy." (*Appel, supra*, 39 Cal.App.3d at p. Supp. 13.) "The government is, essentially, the landlord" because it " 'has so far insinuated itself into a position of interdependence' with this housing project that . . . the project 'cannot be considered to have been so "purely private" as to fall without the scope of' due process requirements inhibiting governmental action." (*Ibid.*, quoting *Burton v. Wilmington Pkg. Auth.* (1961) 365 U.S. 715, 725 [6 L.Ed.2d 45, 81 S.Ct. 856]; see also *McQueen v. Druker* (1st Cir. 1971) 438 F.2d 781, 784–785 [FHA project on site acquired through eminent domain and operated by redevelopment agency involved state action under 14th Amend.].)

The court also concluded the government's housing policy as implemented through federal subsidization, "coupled with acceptance and reliance" by the tenants, "created in [them] a 'status by entitlement,' a species of property, protected by constitutional guarantees of due process of law." (*Appel, supra*, 39 Cal.App.3d at p. Supp. 15.) "A necessary corollary is that [the tenants] may not be deprived of that status through eviction from their home by governmental action without prior notice and proof of good cause." (*Ibid.*; see also *Joy v. Daniels* (4th Cir. 1973) 479 F.2d 1236, 1241 [tenant in FHA-subsidized private housing had "property right or entitlement to continue[d] occupancy until there exists a cause to evict other than the mere expiration of the lease"]; *Mitchell v. Poole* (1988) 203 Cal.App.3d Supp. 1, 3 [249 Cal.Rptr. 842] [relying on *Appel* to find landlord receiving § 8 housing subsidy (see 42 U.S.C. § 1437f) required to identify good cause for eviction].)

Few California cases have revisited the constitutional requirement of just cause eviction in the context of public housing subsidies, probably because both federal and state tenant subsidy programs expressly mandate a showing of good cause to evict subsidized tenants. (See, e.g., 24 C.F.R. § 247.3 (2011) [good cause required for eviction of tenants of federally subsidized projects]; Health & Saf. Code, § 51066, subd. (a) [tenants of housing developments financed by mortgage loan from the Cal. Housing Finance Agency can only be evicted for good cause].) Nonetheless, the California Supreme Court cited *Appel* with approval in considering the constitutionality of a housing finance statute, noting "[t]he role of the Agency in the program before us is very similar to that of the federal government in the housing program considered in *Appel* . . . . In *Appel*, it was held that the federal government's involvement constituted 'state action' necessitating compliance with certain due process requirements before tenants could be evicted." (*California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 591 [131 Cal.Rptr. 361, 551 P.2d 1193].)

Anchor Pacifica challenges this authority, arguing it was undermined by the decision in *People ex rel. Dept. of Transportation v. Lucero* (1980) 114 Cal.App.3d 166 [170 Cal.Rptr. 554] (*Lucero*). In *Lucero*, California's Department of Transportation (Caltrans), acting pursuant to Streets and Highways Code section 104.6,[2] had acquired certain residential properties in the path of future state highway projects and leased one to the defendant tenants on a month-to-month basis. (*Lucero*, at p. 168.) Answering the tenants' due process claim, the court concluded the tenants' property interest was limited to the 30-day notice required by the lease and rejected their contention their tenancies could not be terminated without good cause. (*Id.* at pp. 172–173.) Citing the general rule that "a landlord 'may normally evict a tenant for any reason or for no reason at all . . .' " (*id.* at p. 173), the court characterized *Appel, supra*, 39 Cal.App.3d Supp. 7 as creating a rare exception: "Several exceptions to this general rule have been created by case and statutory law of this state. The broadest departure is in relation to government subsidized housing for low and moderate income families. In *Appel* . . . the Appellate Department of the Los Angeles Superior Court held that tenants in housing projects financed under the Housing and Urban Development Act . . . had a property interest requiring notice of good cause and proof thereof at a hearing before their month-to-month tenancies were terminated. The court relied upon several federal decisions imposing such requirement to carry out

---

[2] Streets and Highways Code section 104.6 authorizes Caltrans to purchase lands for state highway purposes and lease them when they "are not presently needed" "on such terms and conditions as the director may fix and to maintain and care for such property in order to secure rent therefrom."

the policy of the act to provide affordable housing for low and moderate income families." (*Lucero*, at pp. 173–174.) Noting the 1977 enactment of Health and Safety Code section 51066 extending good cause eviction protection to all tenants in state-subsidized housing, the *Lucero* court observed, "It is thus easy to establish a status of entitlement for the tenants of housing . . . established to implement government policy to provide affordable housing for low and moderate income families." (*Lucero*, at p. 174.) The court declined to apply the rationale of *Appel* to the Caltrans tenants, however, because the state had been functioning not in its sovereign role in the furtherance of state policy but in its role as a proprietor of surplus property. (*Lucero*, at p. 175; see, e.g., *City of Glendale v. Superior Court* (1993) 18 Cal.App.4th 1768, 1777–1778 [23 Cal.Rptr.2d 305] [distinguishing between city's proprietary capacity as owner of property and its sovereign capacity allowing it to condemn property].)

Far from undermining *Appel, Lucero* supports its continued viability. Federal decisions during this period, as well, reinforce the analysis offered in *Appel*. (See, e.g., *Halet v. Wend Inv. Co.* (9th Cir. 1982) 672 F.2d 1305, 1310 [finding state action in private landlord's denial of tenant's application when apartment complex developed on county land as part of redevelopment program for purpose of fostering housing; county controlled use and purpose of apartment and rent charged; and developer paid percentage of rent to county]; *Geneva Towers Tenants Organization v. Federal Mortgage Investors* (9th Cir. 1974) 504 F.2d 483 (*Geneva Towers*) [finding state action and protected property interest on part of low-income tenants challenging rent increases for FHA-financed apartments]; *Gallman v. Pierce* (N.D.Cal. 1986) 639 F.Supp. 472, 482–485 [relying on *Appel* to find state action and protected property interest in tenancies supported due process claim of federal § 8 housing subsidy tenants]; cf. *Kabbani v. Council House, Inc.* (W.D.Wn. 2005) 406 F.Supp.2d 1189, 1193–1194 [receipt of § 8 rent subsidies without substantial state involvement in operation of apartment building insufficient to create state action].)

We recognize, however, that more recent United States Supreme Court cases on state action require us to examine the relationship between the City and the Heritage Oaks Apartments to determine whether the holding of *Appel*, which was based on the federal constitution, continues to be valid.

2. *State Action*

In one of the United States Supreme Court's more recent efforts to articulate guidelines for a finding of state action, the court candidly acknowledged the resistance of the doctrine to a single, cogent test: "What is fairly attributable [as state action] is a matter of normative judgment, and the

criteria lack rigid simplicity. . . . [No] one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason . . . ." (*Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S. 288, 295–296 [148 L.Ed.2d 807, 121 S.Ct. 924] (*Brentwood*).)[3] "The judicial obligation is not only to ' "preserv[e] an area of individual freedom by limiting the reach of federal law" and avoi[d] the imposition of responsibility on a State for conduct it could not control,' [citation] but also to assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains . . . .' " (531 U.S. at p. 295.) "[S]tate action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' " (*Ibid.*)

■ Reviewing the court's earlier cases, Justice Souter, writing for the majority, catalogued seven factors that can be relevant in attributing private conduct to the State: (1) when the challenged activity "results from the State's exercise of 'coercive power' "; (2) "when the State provides 'significant encouragement, either overt or covert' "; (3) "when a private actor operates as a 'willful participant in joint activity with the State or its agents' "; (4) when a nominally private entity is "controlled by an 'agency of the State' "; (5) when a private entity has been "delegated a public function by the State"; (6) when the challenged activity "is 'entwined with governmental policies' "; or (7) "when government is 'entwined in [the entity's] management or control.' " (*Brentwood, supra*, 531 U.S. at p. 296.) The court concluded the private nature of the challenged activities there—alleged recruiting violations by a private corporation organized to regulate interscholastic sports among public and private high schools in Tennessee—was "overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there [was] no substantial reason to claim unfairness in applying constitutional standards to it." (*Id.* at p. 298.) This sense of fairness was a crucial element for the majority, which noted the board of the athletic association had once "freely acknowledged" its official character "but now does it by winks and nods." (*Id.* at p. 301.) Justice Souter rejected the dissent's insistence on formal clarity—rather than "winks

---

[3] Courts and commentators have frequently noted the difficulty in harmonizing the Supreme Court's state action jurisprudence: State action cases " 'have not been a model of consistency' " (*Lebron v. National Railroad Passenger Corporation* (1995) 513 U.S. 374, 378 [130 L.Ed.2d 902, 115 S.Ct. 961]); "the line of division separating state and private action remains far from straight" (Metzger, *Privatization as Delegation* (2003) 103 Colum. L.Rev. 1367, 1414); "[n]o area of constitutional law is more confusing and contradictory than state action" (Seidman, *The State Action Paradox* (1993) 10 Const. Comment. 379, 391); and state action is "a conceptual disaster area" (Black, *Foreword: "State Action," Equal Protection, and California's Proposition 14* (1967) 81 Harv. L.Rev. 69, 95).

and nods"—in shaping a test for state action, observing "if formalism were the sine qua non of state action, the doctrine would vanish owing to the ease and inevitability of its evasion." (*Id.* at p. 301, fn. 4, italics omitted.) "[A] criterion of state action like symbiosis . . . looks not to form but to an underlying reality." (*Ibid.*) Although facts demonstrative of state action "may be outweighed in the name of some value at odds with finding public accountability," the arguments raised by the athletic association were unpersuasive. (*Id.* at pp. 303–304.)

The challenged activity in this case is Anchor Pacifica's eviction of Green from her City-subsidized and regulated apartment. Whether state action can be found here rests on a cluster of facts that are undisputed, including the original donation of the land to the City for the purpose of building senior housing, the transfer of the parcel to the City's redevelopment agency for development, the development agreement with Andover that authorized construction and management of the senior housing complex but reserved 30 percent of the units for low- and very-low-income housing, the allocation of a 20 percent share of rents to the City, the reversion of the project to the City upon expiration of the 55-year ground lease, the City's selection and certification of eligible tenants for the subsidized units, the City's oversight of maintenance and rent levels at the complex, as well as the rent subsidies it paid from its own coffers for some of the apartments (including Green's) and its administration of federal subsidies for other apartments in the complex.

Reviewing the factors set forth in *Brentwood, supra,* 531 U.S. at page 296, it is not difficult to identify a pattern of overt City encouragement and participation, if not entwinement in City policy and operational control, in the relevant, *challenged* activity of the complex. Although Anchor Pacifica administered the leases and operated the complex, it was subject to City oversight and approval. Anchor Pacifica, moreover, had little discretion with respect to operation of the low- and very-low-income units: The City dictated the number of low- and very-low-income units, the rents to be charged and the tenants eligible for the units. Anchor Pacifica was required to rent units to the applicants on the City's list. The City then decided who would receive local or federal housing subsidies and paid them to Andover's agent, Anchor Pacifica. We have little trouble concluding there was "such a 'close nexus between the [City] and the challenged action' " that we should treat this "seemingly private behavior '. . . as that of the [City] itself.' " (*Brentwood, supra,* 531 U.S. at p. 295.)

Of course, had the challenged activity involved aspects of Heritage Oaks Apartments' operations other than the City-mandated low-income housing, we would not necessarily conclude it was animated by state action. Here, the inception and regulation of the low-income housing program at the complex

was infused by the City's power, and "there is no substantial reason to claim unfairness in applying constitutional standards to it." (*Brentwood, supra,* 531 U.S. at p. 298; see generally Wells, *Identifying State Actors in Constitutional Litigation: Reviving the Role of Substantive Context* (2004) 26 Cardozo L.Rev. 99 [arguing for evaluation of *Brentwood* factors in light of the substantive context of the challenged activity].)

### 3. *Green's Protected Property Interest*

■ The presence of state action does not give rise to a due process claim by Green if she does not have a protected property interest in her continued tenancy in a subsidized unit at Heritage Oaks Apartments. "The hallmark of property, the [United States Supreme] Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.' [Citations.] Once that characteristic is found, the types of interests protected as 'property' are varied and, as often as not, intangible, relating 'to the whole domain of social and economic fact.' " (*Logan v. Zimmerman Brush Co., supra,* 455 U.S. at p. 430; see *Memphis Light, Gas & Water Div. v. Craft* (1978) 436 U.S. 1, 11 [56 L.Ed.2d 30, 98 S.Ct. 1554]; *Goldberg v. Kelly* (1970) 397 U.S. 254, 262–266 [25 L.Ed.2d 287, 90 S.Ct. 1011]; *Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194, 207 [124 Cal.Rptr. 14, 539 P.2d 774].) "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." (*Board of Regents v. Roth* (1972) 408 U.S. 564, 577 [33 L.Ed.2d 548, 92 S.Ct. 2701].) " ' "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit . . . ." ' " (*Brown v. City of Los Angeles* (2002) 102 Cal.App.4th 155, 169 [125 Cal.Rptr.2d 474] (*Brown*), quoting *Perry v. Sindermann* (1972) 408 U.S. 593, 601 [33 L.Ed.2d 570, 92 S.Ct. 2694].)

That a low-income tenant receiving subsidized housing benefits has a property interest in her continued tenancy seems apparent. As the *Appel* court recognized, " 'The right to decent housing at a rent that can be afforded, the right not to be uprooted, the right to stability as a participant in a particular community, and the right to be left alone are all substantial personal rights . . . . The worth of such rights to a tenant is insusceptible of pecuniary valuation.' " (*Appel, supra,* 39 Cal.App.3d at p. Supp. 15, citation omitted; see *Lucero, supra,* 114 Cal.App.3d at p. 174 ["[i]t is thus easy to establish a

status of entitlement for the tenants of housing which has been established to implement government policy to provide affordable housing for low and moderate income families"].)

■ Nonetheless, because Green was evicted upon the expiration of her lease, not during its term, the question here is whether she had a protectable interest in the lease's renewal. *Appel*, as well as several other decisions discussed above, concluded good cause must be shown even when a tenancy is terminated at the end of the lease. (*Appel, supra*, 39 Cal.App.3d at p. Supp. 9; see also *Mitchell v. Poole, supra*, 203 Cal.App.3d at p. Supp. 3 [landlord receiving federal subsidies required to serve tenants with 30-day notice including statement of reasons constituting good cause]; *Joy v. Daniels, supra*, 479 F.2d at p. 1241 [tenant in FHA-subsidized private housing had "property right or entitlement to continue[d] occupancy until there exists a cause to evict other than the mere expiration of the lease"]; *Gallman v. Pierce, supra*, 639 F.Supp. 472, 483–485 [month-to-month tenants of § 8 subsidized housing have right under Cal. law to identification of good cause for eviction even with 30-days' notice].)

Without seriously challenging the continued vitality of the analyses and holdings of these decisions, Anchor Pacifica argues Green's interest was defined solely by the lease term itself and that any expectation her tenancy would continue indefinitely was vitiated by the City's disavowal in the development agreement it was obligated to pay subsidies to Andover on behalf of any particular tenant. Whether Andover had a right to collect subsidies from the City, however, is not at issue. The scope of Green's expectation was established by the City, not by Andover. (See *Brown, supra*, 102 Cal.App.4th at p. 170 ["while a governing body may elect not to confer a property interest in public employment, it may not constitutionally authorize the deprivation of such interest, once conferred, without appropriate procedural safeguards"].)

The absence of an express term in the approved lease or in City regulations is not definitive in determining whether Green had a legitimate entitlement to the renewal of her tenancy. As the Supreme Court explained in *Perry v. Sindermann, supra*, 408 U.S. 593, a plaintiff complaining of a due process violation may look to the "rules and understandings" or " 'policies and practices' " of the government actor to determine whether he or she has implicitly acquired a legitimate claim to a benefit. (*Id.* at pp. 602–603; accord, *Board of Regents v. Roth, supra*, 408 U.S. at p. 577; see *Geneva Towers, supra*, 504 F.2d at p. 489 ["*Roth* requires more than an abstract needor unilateral expectation of a benefit. And *Sindermann* demonstrates that

the source need not be explicit but can be implicit in the overall workings of a governmental program."].)

■ The evidence presented to the court at the evidentiary hearing on this issue confirms the City, through its policies and practices, fostered Green's expectation she had an entitlement to a continued subsidized tenancy at Heritage Oaks Apartments that could be terminated only upon a showing of good cause. As an initial matter, Green's annual lease was twice renewed, and her rent subsidy approved through the end of the fiscal year ending June 30, 2010. Al Lavin, who had been employed as a redevelopment manager at the City from the mid-1980's until his retirement in 2009, testified he had been responsible for overseeing the day-to-day functions of the Community Redevelopment Agency and its housing activities, including the low-income housing units at Heritage Oaks Apartments. According to Lavin, the subsidies for the 47 low- and very-low-income units set aside under the development agreement had consistently been paid. Although Lavin's testimony was contradicted in part by a more recently hired City official, Jeff Kugel, director of planning and redevelopment, who stated subsidies had not been initiated for all of the low-income tenants of the designated units, Kugel had advised Green that her subsidy would be reinstated if the attempt to evict her failed. Kugel also testified that, based on his experience at the City, those tenants currently receiving subsidies were in no danger of having their subsidies terminated. There is additional evidence in the record that, when local resources were limited, the City relied on alternative sources of funds (both state and federal) and attrition, rather than termination of existing subsidies, to reduce the financial burden of its low-income housing program.[4]

Green thus established, in what was essentially a bifurcated trial, she had a legitimate entitlement to the renewal of her lease, as well as the accompanying rent subsidies, based upon "a governmentally conferred benefit that is rooted in a legal obligation." (*Geneva Towers, supra,* 504 F.2d at pp. 495–496 (dis. opn. of Hufstedler, J.); see *Doe v. Milwaukee County* (7th Cir. 1990) 903 F.2d 499, 503.) Accordingly, it was error for the trial court to reject her defense she was entitled to good cause eviction.

---

[4] Anchor Pacifica contends that the Supreme Court's recent decision in *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231 [135 Cal.Rptr.3d 683, 267 P.3d 580], which upheld an initiative requiring the windup and dissolution of local redevelopment agencies, "virtually assures" the Glendora Community Redevelopment Agency will cease to exist and will required termination of tenant subsidies at Heritage Oaks Apartments. This contention is misguided. Under Health and Safety Code section 34176 the City of Glendora is authorized to retain the housing assets and perform the functions of its redevelopment agency (§ 34176, subd. (a)), and, if it elects not to do so, those activities will be assumed by the Department of Housing and Community Development (§ 34176, subd. (b)). (See generally *California Redevelopment Assn.,* at p. 250 ["redevelopment agencies may continue to make payments and perform existing obligations until other agencies take over"].)

## DISPOSITION

The judgment is reversed. The matter is remanded, and the trial court is directed to enter judgment in favor of Green. Green is to recover her costs on appeal.

Woods, J., and Zelon, J., concurred