Filed 8/22/14  Anchor Pacifica Management Co. v. Green CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ANCHOR PACIFICA MANAGEMENT CO.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHARON GREEN,<br><br>    Defendant and Appellant. | B253529<br><br>(Los Angeles County<br>Super. Ct. [App. Div.] No. BV030513)<br>(Super. Ct. No. 10UJ0127)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>(No Change in Judgment) |

THE COURT:

It is ordered that the opinion filed herein on August 5, 2014 be modified as follows:

1.  On page 6, final sentence of the first full paragraph, beginning "Based on his review of these materials," including footnote 7, is deleted and the following sentence is inserted in its place:

> "Based on his review of these materials, Jardini recommended a 50 percent reduction in hours billed[7] and opined a reasonable hourly rate for the work performed by Green's attorneys was $175 or, in any event, no more than $300.
>
> _____
> [Fn. 7]  Jardini's reductions were based on his assessment of the time a particular task should have required and his opinion that some tasks were more appropriately classified as overhead.

2.  On page 20, the full paragraph beginning "Apart from the highly reduced hourly rate set by the court" is deleted and the following paragraph is inserted in its place. The addition of footnote 15 will require renumbering of all subsequent footnotes.

Apart from the highly reduced hourly rate set by the court, the court unfairly criticized the mode employed by Radel and Larimore to document their hours, questioned their expertise and experience because they are sole practitioners and not employed by a large corporate firm, belittled the complexity of the case and ultimately cut the hours submitted in the first motion by 50 percent, close to the reductions proposed by Anchor Pacifica's fee expert, Jardini.  In particular, substantial time was deducted from the hours reported by Larimore for preparation of appellate briefs, reductions that suggest a startling lack of understanding of the importance and difficulty of appellate litigation.[15] (See *Center for Biological Diversity v. County of San Bernardino, supra,* 188 Cal.App.4th at pp. 616, 620 ["preparation of an appellate brief and record is far more complicated that merely 'repackaging' the trial court brief"]; see also *Horsford v. Board of Trustees of California State University, supra,* 132 Cal.App.4th at pp. 395-396 [finding trial court abused its discretion by disregarding counsel's verified billing records; "verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous"].)

_____

Fn. 15   For instance, Jardini proposed a reduction of 30 hours from the 70 hours reported by Larimore for research and preparation of the opening brief on appeal to the appellate division.  Based on interlineations to the record Green contends were made by the court, it appears the court awarded only eight hours in total for this task.  In another instance Jardini recommended cutting 10 hours from the 30 reported by Radel for preparation of his argument in this court and his appearance.  The trial court also reduced those hours to eight.

There is no change in judgment.  The parties' petitions for rehearing are denied.

_____

PERLUSS, P. J.                    ZELON, J.                    SEGAL, J.* (Assigned)

2

Filed 8/5/14  Anchor Pacifica Management v. Green CA2/7 (unmodified version)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| ANCHOR PACIFICA MANAGEMENT CO.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>SHARON GREEN,<br><br>Defendant and Appellant. | B253529<br><br>(Los Angeles County<br>Super. Ct. [App. Div.] No. BV030513)<br>(Super. Ct. No. 10UJ0127) |

APPEALS from orders of the Superior Court of Los Angeles County, Michael Villalobos, Judge.  Reversed.

Andrew Radel and Jolene Larimore for Defendant and Appellant.

Hahn & Hahn, William K. Henley and Todd R. Moore for Plaintiff and Respondent.

_____

In *Anchor Pacifica Management Co. v. Green* (2012) 205 Cal.App.4th 232 (*Anchor Pacifica I*) we reversed the judgment of the superior court evicting Sharon Green from her publicly subsidized apartment based on the failure of apartment complex manager, Anchor Pacifica Management Co., to provide good cause for terminating her tenancy. We concluded "the inception and regulation of the low income housing program at the complex was infused by the City's power, and 'there is no substantial reason to claim unfairness in applying constitutional standards to it.'" (*Anchor Pacifica I,* at pp. 244-245, quoting *Brentwood Academy v. Tennessee Secondary School Athletic Assn.* (2001) 531 U.S 288, 299 [121 S.Ct. 924, 148 L.Ed.2d 807].)

Green now appeals from orders of the superior court granting only in part her motions for restitution and attorney fees. We reverse the orders and remand for reconsideration.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Prior Appeal*

The Heritage Oaks Apartments (managed by Anchor Pacifica) consist of 151 senior living apartments, 47 of which are reserved for low or very low income tenants pursuant to a development agreement with the City of Glendora.[1] Under that agreement the City provides a list of prospective eligible tenants for the affordable units. The rents chargeable to the low income tenants are limited by affordable housing guidelines; and, at the time this lawsuit was filed, tenants received assistance in the form of rent subsidies funded either by federal housing programs or by funds set aside by the City for that purpose.

---

[1] As we explained in *Anchor Pacifica I*, the City of Glendora Community Redevelopment Agency entered into a development agreement with a private developer to build senior housing on a parcel previously donated to the City for that purpose. In exchange for a 55-year lease of the property, the developer agreed "to develop the land pursuant to the City's specifications, maintain the development with City oversight and pay the City a minimum (at the commencement of the lease) of 20 percent of the net proceeds of the development. Upon expiration of the ground lease, ownership of the improvements will revert to the City as owner of the land." (*Anchor Pacifica I, supra,* 205 Cal.App.4th at p. 237.)

2

In October 2007 Green was certified by the City as eligible for one of the low income housing units. She signed a one-year lease and moved into one of the low income units with a monthly rent of $740. Green paid $328; the City paid Anchor Pacifica the remainder of Green's rent. In December 2008, subject to a renewed one-year lease, Green moved to a first floor apartment with a monthly rent of $758, of which she paid $213. On January 10, 2009 Green signed another one-year lease at the same monthly rate, and the City again subsidized her rent.

On October 8, 2009 Anchor Pacifica served Green with a 90-day eviction notice. The notice did not provide any reason for the termination of her tenancy at the conclusion of her lease. An unlawful detainer action was filed on January 21, 2010. Green answered, asserting, among other defenses, Anchor Pacifica's attempt to evict her without good cause violated her federal and state right to due process. On June 7, 2010 she moved to dismiss the action on the ground Anchor Pacifica had failed to provide good cause for her eviction or, in the alternative, to allow her to present that defense to the jury. The trial court denied the motion, ruling Green had "'failed to prove or show she has an enforceable right [to the subsidy]; the plaintiff is not required to provide good cause notice for terminating a month to month tenancy.'" The case proceeded to trial, and the jury found in favor of Anchor Pacifica, rejecting Green's alternative defense of retaliatory eviction. Judgment was entered on September 17, 2010, and Green was evicted in October 2010. Green appealed to the appellate division of the superior court, which affirmed the judgment.

We granted Green's petition to transfer the appeal to this court pursuant to California Rule of Court, rule 8.1006 and on April 23, 2012 reversed the judgment, finding, in light of the City's involvement with the Heritage Oaks complex, Anchor Pacifica's failure to provide good cause in evicting Green from a subsidized apartment violated her right to due process under the federal and state Constitutions. (*Anchor Pacifica I, supra,* 205 Cal.App.4th at p. 247.)

## 2. *The Restitution Motion*

After she was reinstated to her apartment in November 2012, Green filed a motion seeking "restitution" for harm she had suffered as a result of her October 2010 eviction. Green, who is more than 70 years old, was unable to find an affordable apartment and was forced to live in campgrounds following her eviction. She submitted a declaration describing her health, limited resources and the problems she had encountered during the two years she was displaced from her apartment.[2] She stored some of her belongings but had to abandon or sell the remainder. Because of camp rules barring continuous residence, she was required to purchase annual passes at three campgrounds and move her campsite every two weeks. The extremes of cold and heat and the lack of refrigeration and adequate cooking facilities adversely affected her health. She lived in various campgrounds from October 2010 until July 13, 2012, when, having lost the appeal, Anchor Pacifica agreed to pay the cost of a motel pending the opening of a suitable apartment at the complex.[3] She moved back into her former apartment on November 28, 2012.

Green claimed damages in the amount of $18,192 for the rental value of her lost apartment; $31,714 in expenses caused by her eviction and need for alternative housing; $100 per day ($73,000) for her loss of quiet enjoyment of her leasehold; $70,000 for her physical and emotional suffering; punitive damages in the amount of $616,570; and a lifetime tenancy at the subsidized rate she previously paid for her apartment.

The trial court denied all claims except for the rental value of the apartment, which the court limited to the $545 monthly subsidy for 24 months ($13,080), offset by the amount Green did not pay toward rent during the pendency of the unlawful detainer

---

[2] Green suffers from fibromyalgia and chronic fatigue syndrome and is permanently disabled. Her monthly income as of the date of the motion was $886.40. She has difficulty walking and depends on a wheelchair for mobility. She also has sleep apnea and requires a breathing machine to sleep. While living in campgrounds, Green was required to leave her wheelchair and breathing machine in storage.

[3] For reasons not evident in the record, Anchor Pacifica stopped paying for the motel room on November 8, 2012.

proceedings ($2,130) and the amount paid by Anchor Pacifica to house Green in a motel for the four months immediately preceding her return to the complex ($8,758). Because Anchor Pacifica had rented Green's apartment to another tenant for 24 months and received $17 more per month in rent than Green had been paying, the court added $408 to Green's recovery under a theory of unjust enrichment. The entire sum awarded by the court for the two-year interruption in Green's tenancy was $2,600, plus postjudgment interest.

    3. *The Motion for an Award of Attorney Fees*

Based on the attorney fee provision in her lease agreement, Green moved pursuant to Civil Code section 1717[4] for an award of attorney fees as the prevailing party on the contract claims after the remittitur issued in *Anchor Pacifica I.* She also requested a supplemental fee award in conjunction with her motion for restitution. In support of the fee motion Green's attorneys, Andrew Radel and Jolene Larimore, submitted time records totaling 586 hours and sought payment at an hourly rate of $800 for a lodestar amount of $468,800.[5] They supported their proposed hourly rate with declarations from lawyers experienced in litigating public housing and other civil rights lawsuits, who provided information about hourly rates awarded by courts in their own litigation, as well as fees sought in pro bono cases by lawyers at large Los Angeles law firms.[6] Green's lawyers also requested a multiplier of 2.0, based on the contingent risk of not being paid

---

[4]    Statutory references are to the Civil Code unless otherwise indicated.

[5]    Radel (a 1982 law school graduate) and Larimore (a 1969 law school graduate), have, between them, more than 75 years of experience. Although they are both sole practitioners, they have frequently litigated cases together to take advantage of Radel's trial experience and Larimore's appellate expertise. Radel explained at the hearing on the motion that he and Larimore maintain their time sheets in accordance with the guidelines for publicly funded legal firms like the California Appellate Project or the Alternate Public Defender's Office. According to Radel, those systems do not require the kind of detailed daily time-keeping typical of private law firms and allow tasks performed over the course of several days to be reported in a single entry.

[6]    Civil rights lawyers stated they had been awarded fees based on hourly rates as high as $725; and Westlaw-generated reports reflected court-awarded hourly rates for private firms ranging from $665 to $1,050 for partners and $350 to $725 for associates.

in the case and the public benefit associated with the final ruling on appeal. (See, e.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*).) The total award requested was $937,600.

Anchor Pacifica opposed the motion with the declaration of Andre Jardini, a lawyer with extensive trial experience who also handles arbitrations between attorneys and clients for the Alternative Dispute Resolutions Services Program. Jardini reviewed the time reports submitted by Green's attorneys and opined they had overbilled with respect to certain tasks and had in some instances reported hours in excess of 24 per day. Jardini attached to his declaration a survey of legal fees charged by lawyers in different regions practicing in particular fields with varying years of experience. According to the survey the average hourly rate of California lawyers with more than 20 years of experience was $441 in 2011, but Jardini opined Radel and Larimore's rate should be in the lower quartile of reported rates (less than $360) because they were sole practitioners and rates in landlord-tenant matters typically fall below those in other fields. He also attached a summary of hours billed by Anchor Pacifica's lawyer in the case (hired at an hourly rate of $175) that totaled one-third of the hours submitted by Green's lawyers. Based on his review of these materials, Jardini recommended a reduction of 137 hours in time billed[7] and opined a reasonable hourly rate for the work performed by Green's attorneys was no more than $300.

After a hearing on the motion the trial court awarded fees of $87,900, a figure reached by setting an hourly rate of $300, multiplied by 293 hours, 50 percent of the hours submitted by Radel and Larimore. In selecting an hourly rate of $300 the court cited several factors, including the rate charged by Anchor Pacifica's attorney, the fact the fee had not been negotiated, Radel's and Larimore's experience in criminal litigation

---

[7]     Jardini's reductions were based on his assessment of the time a particular task should have required and his opinion that some tasks were more appropriately classified as overhead. With a few exceptions, the reporting by Radel and Larimore of hours in excess of 24 on several days did not appear to affect Jardini's assessment of the appropriate time credited for specific tasks.

6

did not compare with the experience of the lawyers cited in the supporting declarations, and the lack of complexity of the case, which originated as an ordinary unlawful detainer matter. As the court explained, "While these issues may have taken more time to handle, the issues were not overly complex nor did they necessarily require a superior level of skill to try. This was not a class action suit, there were no expert witnesses involved, or complicated scientific or medical evidence, nor can it be classified as a suit brought to enforce civil rights. It was simply an eviction that happened to involve a due process issue because of the City's involvement with Green's apartment."

The court declined to apply a multiplier or enhancement to the lodestar of $87,900: "While the court is in agreement that this case may in fact have significant impact in cases involving low-income tenants in either state or local subsidized housing, the court is not convinced that this case involved extreme difficulty or required extraordinary legal skills. The issues in the case were not overly complex, and while the due process issue required additional litigation, the case could have been handled by most competent attorneys that are familiar with the issues raised in these kinds of cases. In setting the hourly rate of $300, the court took into consideration that this case was unusual and should be set at a higher rate than the usual unlawful detainer action. However, to increase the total fee award beyond the lodestar amount, especially by doubling the award, would clearly be excessive and an abuse of discretion."

Green also sought a supplemental award of fees for the 54 hours spent by Radel in subsequent proceedings, including the preparation of the motion for restitution. The trial court denied that request, finding that he had already been "amply compensated" for his work in the case.

The appellate division of the superior court reversed the restitution order to the extent it denied Green any consequential damages based on having to seek alternative shelter but otherwise affirmed the trial court's orders. We granted both of Green's petitions for transfer to this court.

7

**DISCUSSION**

1. *The Trial Court Miscalculated the Amount of Green's Restitution Damages*

"Code of Civil Procedure section 908 provides that, upon the reversal or modification of a judgment, 'the reviewing court may direct that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order. In doing so, the reviewing court may order restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment or order. . . .' Although this statutory provision is limited to 'the reviewing court,' a trial court whose order or judgment has been reversed on appeal has inherent authority to afford similar relief." (*Gunderson v. Wall* (2011) 196 Cal.App.4th 1060, 1065 (*Gunderson*).) "'The fundamental rule guiding the court in [such] proceeding[s] [i]s, so far as possible, to place the parties in as favorable a position as they could have been in had the judgments not been enforced pending appeal.'" (*Ibid.*, quoting *Stockton Theatres, Inc. v. Palermo* (1953) 121 Cal.App.2d 616, 632.) "Whether a party is entitled to restitution following reversal 'present[s] a question calling for judicial discretion in determining what equity required.' [Citation.] The court's ruling will not be disturbed 'in the absence of a showing of manifest abuse of . . . discretion.'" (*Gunderson,* at p. 1065.)

A displaced tenant may recover restitution either in the underlying unlawful detainer action when an initial judgment for the landlord is reversed on appeal or in a separate action instituted to recover losses incurred as a result of a reversed judgment. (*Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 658 (*Munoz*); see *Gunderson*, *supra,* 196 Cal.App.4th at p. 1065; *Stockton Theatres, Inc. v. Palermo, supra,* 121 Cal.App.2d at pp. 619-621.) "'When the judgment or order is reversed or modified, the reviewing court may direct that the parties be returned so far as possible to the positions they occupied before the enforcement of or execution on the judgment or order. In doing so, the reviewing court may order restitution on reasonable terms and conditions of all property and rights lost by the erroneous judgment or order, so far as such restitution is consistent with rights of third parties and may direct the entry of a money judgment sufficient to

8

compensate for property or rights not restored.'" (*Munoz,* at p. 657.) Restitution is based "'upon the theory that, in equity, the party who receives money or property in good faith under an erroneous judgment, thereafter reversed, should be required to restore what he has received, and not upon the theory of a supposed wrong committed . . . .'" (*Stockton Theatres, Inc.,* at p. 619; see *Pay Less Drug Stores v. Bechdolt* (1979) 92 Cal.App.3d 496, 501 [restitution provides an equitable quasi-contractual remedy allowing "'the restoration of the injured party to as good a position as that occupied by him before the contract was made'"]; *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 346 ["[w]hether termed unjust enrichment, quasi-contract, or quantum meruit, the equitable remedy of restitution when unjust enrichment has occurred 'is an *obligation* (not a true contract [citation]) created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his or her former position by return of the thing or its equivalent in money'"].)

Under these principles Green was entitled to possession of her apartment (or an equivalent one), as well as a money judgment in the amount necessary to compensate for her loss of housing during the period she was not in possession. The facts here are unusual: Green could not afford an alternative apartment so she sequentially rented campsites at three different campgrounds. Consequently, the loss to Green from being evicted is the full fair market rental value of the apartment reduced by the amount, if any, Green saved in rent by paying campsite fees rather than $213 per month to Anchor Pacifica, multiplied by the number of months she was displaced from her apartment.[8]

With regard to Anchor Pacifica's allowable offset from this total, the trial court did not err in allowing an offset for Green's $213 monthly obligation she did not pay during the unlawful detainer proceedings. However, there was no rational basis for the court to allow Anchor Pacifica to offset the full amount it paid to the motel between

---

[8]    The same result should be reached by adding the $545 monthly subsidy, the additional $17 per month paid by the tenant who replaced Green (assuming that amount brings the actual rent charged to fair market value)—the two factors used by the trial court—and the monthly camping fees paid by Green for each month she was displaced.

9

July 12, 2012 and November 8, 2012 ($8,758) after this court reversed the judgment and it was evident Green was entitled to reinstatement to either her former apartment or an equivalent one. Rather than immediately provide Green with an appropriate wheelchair-accessible apartment, Anchor Pacifica elected to house her in the motel.[9]

Although not awarded by the trial court, Green is also eligible for an award of prejudgment interest, as permitted by section 3287.[10] (See *Gunderson, supra,* 196 Cal.App.4th at pp. 1066-1067, citing *Stockton Theatres, Inc. v. Palermo, supra,* 121 Cal.App.2d at p. 632 and *PSM Holding Corp. v. National Farm Financial Corp.* (C.D. Cal. 2010) 743 F.Supp.2d 1136, 1155.) "In general, interest [in restitution cases] is awarded unless it would be inequitable under the circumstances." (*Cussler v. Crusader Entertainment* (2012) 212 Cal.App.4th 356, 369.) On remand the trial court should assess whether such interest should be awarded on the $545 monthly subsidy that all parties agree is a proper component of the restitution award, commencing at the time of her eviction, and award postjudgment interest on the final quantum of Green's restitution recovery. (See *Gunderson,* at p. 1066.)

---

[9] Put somewhat differently but with the same economic result, the period used to calculate Green's general damages could be revised to end in July 2012 rather than November 2012. There is some question in the record, however, why Anchor Pacifica refused to pay for the motel after November 8, 2012 pending Green's return to the unit on November 28, 2012. If the unit was made available as of November 8, 2012, that date should be used to calculate her base rental damages.

[10] Section 3287, subdivision (a), provides for the payment of prejudgment interest to every person entitled to receive damages that are certain or capable of being made certain by calculation if the right to receive such damages vested on a particular day. "Under section 3287, subdivision (a) the court has no discretion, but must award prejudgment interest upon request, from the first day there exists both a breach and a liquidated claim." (*North Oakland Medical Clinic v. Rogers* (1998) 65 Cal.App.4th 824, 828.) "The policy underlying authorization of an award of prejudgment interest is to compensate the injured party—to make that party whole for the accrual of wealth which could have been produced during the period of loss." (*Cassinos v. Union Oil Co.* (1993) 14 Cal.App.4th 1770, 1790; accord, *Wisper Corp. v. California Commerce Bank* (1996) 49 Cal.App.4th 948, 958.)

Green is not entitled, however, to the consequential damages she seeks by way of her motion for restitution. When a judgment is reversed, "restitution must be made of all that has been received under it, and no further liability should be imposed." (*City of Oakland v. Buteau* (1934) 219 Cal. 745, 858; see *Stockton Theatres, Inc. v. Palermo*, *supra*, 121 Cal.App.2d at p. 619 ["[r]estitution must be made of all that was received under the erroneous judgment, but no further liability should be imposed"]; see also *FilmTec Corp. v. Hydranautics* (Fed.Cir. 1995) 67 F.3d 931, 939-940 [denying recovery of "business losses" suffered during pendency of subsequently vacated preliminary injunction, noting that "the remedy of restitution is not a substitute for an action in damages"]; *In re Popkin & Stern* (Bankr. 8th Cir. 2001) 263 B.R. 885, 890 ["courts have universally held that where a judgment is reversed, appellants are entitled to restitution of the benefits received by the other party (plus costs and interest), but to no more"]; *PSM Holding Corp. v. National Farm Financial Corp.*, *supra*, 743 F.Supp.2d. at pp. 1150-1154 [ordering restitution of transferred shares of stock and an accounting of profits after reversal of the judgment, but concluding that "the categories of consequential damages defendants seek are not restitution that is properly awarded following reversal of the judgment"]; Rest.3d Restitution & Unjust Enrichment, § 49 at p. 176 ["[a] claimant entitled to restitution may obtain a judgment for money in the amount of the defendant's unjust enrichment"].) Anchor Pacifica simply "is not chargeable with more than [it] received." (*Stockton Theatres, Inc.*, at p. 620.)

Likewise, tort damages, including punitive damages, are not available to a tenant who has been evicted pursuant to judicial process. (*Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873, 898-899, 901; *Munoz, supra,* 195 Cal.App.4th at pp. 653-654; see *Erlich v. Menezes* (1999) 21 Cal.4th 543, 554 [rejecting claim for emotional distress damages resulting from breach of construction contract; tort damages may be available only when "'one party intentionally breaches the contract intending or knowing that such a breach will cause severe, unmitigable harm in the form of mental anguish, personal hardship, or substantial consequential damages'"]; § 3294 [punitive damages available only for breach of an obligation not arising from contract].) The trial court did not err in

11

declining to award noneconomic damages for Green's pain and suffering or punitive damages; and we decline Green's invitation to extend tort remedies, including punitive damages, to an eviction conducted pursuant to judicial process on the theory Anchor Pacifica owed her an independent duty based on her precarious financial condition. (See *Ginsburg,* at pp. 903-904.) While the consequences of Green's eviction were undoubtedly traumatic and, for that matter, foreseeable, Anchor Pacifica's compliance with judicial process insulates it from tort liability on this ground. (See *Munoz,* at pp. 653-654.)

2. *Green May Recover Consequential Damages Through a Separate Action for Breach of Contract*

"Unlawful detainer actions are necessarily expedited because of the limitations imposed on pleadings and issues that may be litigated. The only triable issue is the right to possession and incidental damages resulting from the unlawful detention." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2007) 155 Cal.App.4th 425, 452.) As a summary proceeding concerned solely with possession, a defendant may not file a cross-complaint until possession has been relinquished and the proceeding has converted to an ordinary civil action. (See § 1952.3, subd. (a); *Knowles v. Robinson* (1963) 60 Cal.2d 620, 625.) Other issues, including claims for breach of the underlying lease, must be litigated in a separate civil proceeding. (See *Munoz, supra,* 195 Cal.App.4th at p. 658 [tenant who prevailed on appeal permitted to bring separate action for breach of contract]; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1032-1033 [tenant may bring breach of contract action if landlord denies use of the property during pendency of lease].) Thus, any compensatory damages not recoverable by Green in a restitution award must be sought in a separate action for breach of contract.

*Munoz* is instructive: The landlord sued his tenant for unlawful detainer after the expiration of the initial term of a commercial lease. (*Munoz, supra,* 195 Cal.App.4th at p. 650.) After obtaining judgment and a writ of possession, the landlord evicted the tenant. (*Id.* at p. 651.) The tenant, like Green, prevailed on appeal and then sued the landlord for breach of contract on the ground her eviction violated the terms of the lease.

12

(*Id*. at p. 653.) The trial court granted the landlord's summary judgment motion, ruling the tenant had no cause of action because her eviction from the premises had been secured by judicial process. (*Id*. at pp. 651-654.) The Court of Appeal reversed. Acknowledging the tenant was barred from suing the landlord for the tort of wrongful eviction because the eviction had been obtained through the judicial process (*id*. at p. 655), it reasoned, "[A] tenant may bring a breach of contract action if the landlord denies the tenant use of the real property described in the lease for the period of time specified in the lease. [Citation.] . . . [T]he tenant's rights under the lease do not disappear merely because the landlord initiates an unlawful detainer action; it is possible (depending on the particular circumstances of the case) that a victorious tenant in an unlawful detainer action may have a contract claim against the landlord seeking to evict her." (*Id*. at pp. 656-657.) The court concluded there was "a triable issue of fact as to whether MacMillan breached the lease by actually *enforcing* the initial unlawful detainer judgment and evicting Munoz. If Munoz has suffered damages as a result of the alleged breach, she can pursue applicable remedies for breach of contract." (*Id*. at p. 659.)

In *Munoz* the tenant had not sought restitution in the unlawful detainer action before filing a separate action for breach of contract. The *Munoz* court, therefore, was not required to consider whether the tenant could have brought her breach of contract action after seeking restitution in the unlawful detainer action or whether the scope of those remedies differed. As the court explained, "It is worth noting that the 'restitution' remedy described in Code of Civil Procedure section 908 does not necessarily differ greatly from a breach of contract remedy." (*Munoz, supra,* 195 Cal.App.4th at p. 659, fn. 7 [comparing similar language of Code Civ. Proc., § 908 to language of Civ. Code, § 3300: "For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the natural course of things, would be likely to result therefrom"].) "It is unnecessary in this appeal . . . to delve into the precise contours of remedies available to Munoz under either theory." (*Munoz,* at p. 559, fn. 7.)

13

This case presents the question not reached in *Munoz*. Given the inherent limitations on the remedy of restitution, as discussed above, Green's claim for breach of contract, while not cognizable in an unlawful detainer action pending resolution of the question of possession, was available to her on remand in addition to, or in lieu of, her summary claim for restitution. The restitution motion asserted by Green and her potential action for breach of contract are not inconsistent remedies: As the Supreme Court has stated, ". . . one who has been injured by a breach of contract has an election to pursue any of three remedies, to wit: 'He may treat the contract as rescinded and may recover upon a quantum meruit so far as he has performed; or he may keep the contract alive, for the benefit of both parties, being at all times ready and able to perform; or, third, he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing.'" (*Alder v. Drudis* (1947) 30 Cal.2d 372, 381; accord, *Oliver v. Campbell* (1954) 43 Cal.2d 298, 302.) Throughout this case Green has affirmed the validity of the lease and her right to possession. (See *Munoz, supra*, 195 Cal.App.4th at pp. 660-661; *id.* at p. 661 ["It would be odd to say Munoz is required to seek restitution for the loss of her rights, but cannot seek recovery for breach of contract. It is the *lease* (an actual contract, not one implied by law) that entitled Munoz to possession of the premises. It is the *lease* that defines the rights Munoz lost when the initial judgment was enforced (the time period she was entitled to possess the premises). There is no need in this case for Munoz to plead quasi-contract or quantum meruit—she has an actual contract."].)

Damages recoverable by Green for breach of the lease agreement necessarily include those resulting from Anchor Pacifica's breach of the implied covenant for quiet enjoyment inherent in any lease (see *Black v. Knight* (1917) 176 Cal. 722, 725 ["if the tenant is actually ousted from possession under process issued upon [a judgment of eviction], he may treat such ouster as a breach of the implied covenant for quiet enjoyment, and recover his damages in the event of a reversal of the judgment"]), as well as the foreseeable, consequential damages (otherwise known as special damages) she

14

sought through her restitution motion.[11]  Green's requested special damages included the costs of storing her belongings while she was displaced, moving expenses, campground fees, camping equipment and various other health and medical costs she claims resulted from her eviction.  On a breach of contract claim, Green may seek to recover reasonable moving and storage expenses and her foreseeable, camping-related expenses, including campground fees, that were not recovered in a motion for restitution.[12]  Other items claimed by Green, if any, and the reasonable amount to be awarded must be considered by the trial court if she decides to proceed with an independent action.[13]

3. *The Trial Court Abused Its Discretion in Its Determination of the Attorney Fees Award*

a. *Governing law*

Section 1717, subdivision (a), authorizes the trial court to award reasonable attorney fees to the prevailing party in a contract action if the contract specifically

---

[11]  "Unlike general damages, special damages are those losses that do not arise directly and inevitably from any similar breach of any similar agreement.  Instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties.  Special damages are recoverable if the special or particular circumstances from which they arise were actually communicated to or known by the breaching party (a subjective test) or were matters of which the breaching party should have been aware at the time of contracting (an objective test).  [Citations.]  Special damages 'will not be presumed from the mere breach' but represent loss that 'occurred by reason of injuries following from' the breach.  [Citation.]  Special damages are among the losses that are foreseeable and proximately caused by the breach of a contract."  (*Lewis Jorge Construction Management, Inc. v. Pomona Unified School Dist.* (2004) 34 Cal.4th 960, 968-969.)

[12]  Green advised Anchor Pacifica she would be homeless if evicted and forced to live in a campground.

[13]  We leave valuation of these damages for remand:  "Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.  [Citations.]  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."  (*GHK Associates v. Mayer Group, Inc.* (1990) 224 Cal.App.3d 856, 873.)

15

provides for an award of such fees.[14]  "[T]he party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract."  (§ 1717, subd. (b)(1).)  "[W]hen a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a matter of law."  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876; accord, *Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 440.)  "[W]hen the decision on the litigated contract claims is purely good news for one party and bad news for the other . . . a trial court has no discretion to deny attorney fees to the successful litigant."  (*Hsu,* at p. 876; see *Zintel Holdings,* at p. 443.)  Anchor Pacifica does not dispute that Green is entitled to an award of attorney fees in this case.

Attorney fee awards should be "fully compensatory"; absent circumstances rendering the award unjust, parties who qualify for a fee should recover compensation for "*all* the hours *reasonably spent* " in litigating an action to a successful conclusion. (*Ketchum, supra,* 24 Cal.4th at p. 1141; see *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 394; *Meister v. Regents of University of California* (1998) 67 Cal.App.4th 437, 447 ["'"unless special circumstances would render such an award unjust,"' 'parties who qualify for a fee should recover for all hours *reasonably spent*'"'"], quoting *Serrano v. Unruh* (1982) 32 Cal.3d 621, 633, 639; see also *Hensley v. Eckerhart* (1983) 461 U.S. 424, 430 [counsel for prevailing parties should be paid for all time reasonably expended on a matter].)

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 (*PLCM Group*)); accord,

---

[14]      Section 1717, subdivision (a), provides:  "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.  [¶] . . . [¶] Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

16

*Ketchum, supra,* 24 Cal.4th at p. 1134.) "It is not necessary to provide detailed billing timesheets to support an award of attorney fees under the lodestar method. (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 254-255 [affirming lodestar fee award based on 'declarations evidencing the reasonable hourly rate for [the attorneys'] services and establishing the number of hours spent working on the case'; 'California case law permits fee awards in the absence of detailed time sheets']; see *Mardirossian & Associates v. Ersoff* (2007) 153 Cal.App.4th 257, 269 ['there is no legal requirement that an attorney supply billing statements to support a claim for attorney fees'].) Declarations of counsel setting forth the reasonable hourly rate, the number of hours worked and the tasks performed are sufficient. (*Steiny & Co. v. California Electric Supply Co.* (2000) 79 Cal.App.4th 285, 293 ['[a]n attorney's testimony as to the number of hours worked is sufficient to support an award of attorney fees, even in the absence of detailed time records'].) '"Although a fee request ordinarily should be documented in great detail, it cannot be said . . . that the absence of time records and billing statements deprive[s] [a] trial court of substantial evidence to support an award . . . ."'" (*Concepcion v. Amscan Holdings, Inc.* (2014) 223 Cal.App.4th 1309, 1324-1325.)

The Supreme Court in *Ketcham* explained the lodestar "may be adjusted by the court based on factors including . . . (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award. [Citation.] The purpose of such adjustment is to fix a fee at the fair market value for the particular action." (*Ketchum, supra,* 24 Cal.4th at p. 1132; see *Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834 ["no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation"]; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 628.) As relevant in this case, *Ketchum* instructs the fair market value of services provided by a lawyer who represents a client unable to pay his or her fees is higher than that provided by a lawyer consistently paid through the course of the litigation: "The purpose of a fee enhancement, or so-called multiplier, for contingent risk

17

is to bring the financial incentives for attorneys enforcing important constitutional rights . . . into line with incentives they have to undertake claims for which they are paid on a fee-for-services basis.  [¶]  . . . 'A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but [also] for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans.'  [Citation.]  'A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases.'"  (*Ketchum*, at pp. 1132-1133; accord, *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 623 ["'[a]n enhancement of the lodestar amount to reflect the contingency risk is "[o]ne of the most common fee enhancers"'"].)

The need for the proper reward of contingent counsel through fee-shifting statutes is even more pronounced when the issues affect the public interest:  "In cases involving enforcement of constitutional rights, but little or no damages, such fee enhancements may make such cases economically feasible to competent private attorneys."  (*Ketchum, supra,* 24 Cal.4th at p. 1133; accord*, Horsford v. Board of Trustees of California State University, supra,* 132 Cal.App.4th 359, 394-395 ["[i]t has long been recognized . . . the contingent and deferred nature of the fee award in a civil rights or other case with statutory attorney fees requires that the fee be adjusted in some manner to reflect the fact that the fair market value of legal services provided on that basis is greater than the equivalent noncontingent hourly rate"].)

Ordinarily, "[t]he '"experienced trial judge is the best judge of the value of professional services rendered in his court, and while his judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'"  (*Ketchum, supra,* 24 Cal.4th at p. 1132; see *PLCM Group, supra,* 22 Cal.4th at p. 1096.)  Nonetheless, while "'deferential,'" the abuse of discretion standard "'is not

18

empty.'" (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 537.) "'"[I]t asks in substance whether the ruling in question 'falls outside the bounds of reason' under the applicable law and the relevant facts."'" (*Ibid.*) Moreover, a significant portion of the time spent in this case involved appeals of the trial court's adverse ruling to the appellate division of the superior court and to this court, as well as the successful effort to oppose depublication by the Supreme Court of our decision in *Anchor Pacifica I.* When we review an award of attorney fees for appellate work, we need not accord the same degree of deference to the trial court's evaluation of the reasonableness of the time devoted to the tasks involved as we would to rulings that involve the trial court's direct knowledge. (*Center for Biological Diversity v. County of San Bernardino, supra,* 188 Cal.App.4th at p. 616; see *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1, 5 ["an appellate court owes only limited deference to a trial court determination on this issue [of an award of attorney fees] when the successful legal action resulted in a published appellate opinion"].)

b. *The record does not support the trial court's extensive reductions in the requested fees*

Although the trial court was not obligated to award Green's counsel the full $937,600 they had requested, its award of $87,900—less than 10 percent of the total sought—was an abuse of discretion, reflecting the court's lack of appreciation for the significance of the constitutional right asserted by counsel and recognized by this court in *Anchor Pacifica I*, its failure to understand the complexities of appellate litigation and its total disregard for the risks of nonpayment accepted by Green's lawyers when they agreed to represent her in this case. We start from the undisputed fact that Green had no ability to pay an attorney to defend her in the wrongful detainer action brought by Anchor Pacifica. Nor did anyone other than Radel and Larimore step in to represent her. At the time Radel and Larimore agreed to defend Green, neither Anchor Pacifica nor the City had disclosed to Green the extent of the City's entanglement with the Heritage Oaks Apartments; and Green's attorneys spent considerable time unearthing this relationship, a set of facts that ultimately resulted in our finding of state action. (See *Anchor Pacifica I,*

19

*supra,* 205 Cal.App.4th at pp. 244-245.) Even with the prospect of a constitutional defense to the eviction, Green's attorneys could not be assured of reward when they volunteered to represent her and could not know what time commitment would be required. Nonetheless, they believed in the merits of Green's defense and the public importance of upholding constitutional principles.

The court had before it ample evidence that attorneys with the level of experience of Radel and Larimore regularly billed at hourly rates far exceeding $300 in cases comparable to this one. While we agree that an $800 hourly rate appears too high, there is a vast gap between $300 and $800. We remand this issue for reconsideration, particularly with respect to the appropriate hourly rate for appellate work in matters involving constitutional rights.

Apart from the highly reduced hourly rate set by the court, the court unfairly criticized the mode employed by Radel and Larimore to document their hours, questioned their expertise and experience because they are sole practitioners and not employed by a large corporate firm, belittled the complexity of the case and ultimately cut the hours submitted in the first motion by 50 percent, far in excess of the reductions proposed by Anchor Pacifica's fee expert. Jardini, a trial lawyer, proposed a reduction of 137 hours from the total reported by Radel and Larimore, almost entirely attributable to Larimore's work on the appellate phase of the case. For instance, Jardini proposed a reduction of 30 hours from the 70 hours reported by Larimore for research and preparation of the opening brief on appeal to the appellate division. The trial court, based on its interlineations to the record and its findings, apparently awarded only eight hours in total for this task. In another instance Jardini recommended cutting 10 hours from the 30 reported by Radel for preparation of his argument in this court and his appearance. The trial court also reduced those hours to eight. These reductions were wholly unreasonable, suggesting a startling lack of understanding of the importance and difficulty of appellate litigation. (See *Center for Biological Diversity v. County of San Bernardino, supra,* 188 Cal.App.4th at pp. 616, 620 ["preparation of an appellate brief and record is far more complicated that merely 'repackaging' the trial court brief"]; see

20

also *Horsford v. Board of Trustees of California State University, supra,* 132 Cal.App.4th at pp. 395-396 [finding trial court abused its discretion by disregarding counsel's verified billing records; "verified time statements of the attorneys, as officers of the court, are entitled to credence in the absence of a clear indication the records are erroneous"].)

In addition, the entirely appropriate request for an enhancement of the lodestar fee calculation based on the contingent nature of the representation and its public value went unheeded.[15] That decision must be revisited.

The court also improperly refused to award additional fees for Radel's successful work (54 hours) seeking restitution on Green's behalf on the theory Green's counsel had already been adequately compensated for their work. Recognizing the likely error in the trial court's dismissive enough-is-enough analysis, the appellate division nonetheless affirmed the complete denial of any fees for counsel's work on the restitution motion on the ground the court's possible use of an incorrect legal standard was harmless error. Ignoring the fact it had remanded the matter for the trial court to properly assess Green's entitlement to consequential damages for her unlawful eviction, the appellate division reasoned the recovery of only $2,600 on the motion did not qualify Green (presumably as a matter of law) as the prevailing party within the meaning of section 1717, subdivision (b)(i). This, too, was error. Green's motion for restitution was not a distinct or separate action for breach of the parties' lease but rather part of her defense to Anchor Pacifica's attempt to evict her. The prevailing party analysis under section 1717 must be made on the contract claims as a whole in the lawsuit, not discrete proceedings within the single action. (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 539-540; see *Hsu v. Abarra, supra,* 9 Cal.4th at p. 876 ["[t]he prevailing party determination is to be made only upon final resolution of the contract claims and only by

---

[15] Apparently embracing the view asserted by Anchor Pacifica's expert Jardini that our decision reversing the unlawful detainer judgment merely followed the decades-long ruling in *Appel v. Beyer* (1974) 39 Cal.App.3d Supp. 7, the trial court minimized the significance of the decision and the role of counsel in securing that result, notwithstanding the fact that both Anchor Pacifica and the court failed to recognize and follow that ruling.

'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions'"].)  When viewed in that light, even if Green did not achieve a "simple, unqualified win" on the contract claims at issue in the litigation, it would be an abuse of discretion not to conclude she had "recovered a greater relief in the action on the contract" whatever the size of her ultimate restitution award.  (§ 1717, subd. (b).)

In sum, the resulting fee award was wholly inadequate.  Under *Ketchum* and its progeny Green's lawyers were entitled, at a minimum, to recover a fee award that honored the time spent on the case, their lengthy experience and the contingent nature of their relationship with Green, whom they represented with diligence and resilience.  The court's fee award did not comport with these principles.

## DISPOSITION

The orders granting in part Green's motions for restitution and attorney fees are reversed and the cause remanded for further consideration, consistent with this opinion, of those motions and any related matters.  In the interests of justice, all further proceedings shall be heard before a trial judge other than the judge whose orders are affected by this decision.  (Code Civ. Proc., § 170.1, subd. (c).)

Green is to recover her costs, including attorney fees, on appeal.  (*Starpoint Properties, LLC v. Namvar* (2011) 201 Cal.App.4th 1101, 1111 [pursuant to § 1717 prevailing party in an action on or relating to a contract providing for an award of attorney fees is entitled to recover its fees whether incurred at trial or on appeal].)


PERLUSS, P. J.

We concur:


ZELON, J.


SEGAL, J.[*]

---

[*]    Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

22